**BEDFORD MEDICAL CENTER,**
**Plaintiff-Appellant,**

v.

**Margaret M. HECKLER, Secretary of**
**Health & Human Services,**
**Defendant-Appellee.**

**No. 84–2453.**

United States Court of Appeals,
Seventh Circuit.

Argued April 24, 1985.

Decided July 1, 1985.

---

Carson P. Porter, Rice, Porter & Seiller, Louisville, Ky., for plaintiff-appellant.

Alan S. Dorn, Asst. Reg. Atty., Dept. of Health & Human Services, Chicago, Ill., for defendant-appellee.

Before COFFEY and FLAUM, Circuit Judges, and GIBSON, Senior Circuit Judge.[*]

FLOYD R. GIBSON, Senior Circuit Judge.

The plaintiff, Bedford Medical Center, appeals from a district court's decision which affirmed the defendant's, Margaret Heckler, Secretary of Health and Human Services, decision denying the plaintiff reimbursement under the Medicare Act for certain expenses. We affirm.

I.

The plaintiff is a 117–bed, general, short-term hospital located in Bedford, Indiana. During the relevant time periods, the plaintiff was a Medicare certified "provider of

---

[*] The Honorable Floyd R. Gibson, United States Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

services." 42 C.F.R. §§ 489.1–489.11 (1982). In accordance with Medicare requirements, the plaintiff submitted to the fiscal Intermediary [1] cost reports for fiscal years ending June 30, 1977, June 30, 1978, and September 30, 1979. 42 C.F.R. § 405.-406 (1982). Upon its review of these reports the Intermediary made certain adjustments. For fiscal years 1977 and 1978, the Intermediary disallowed costs for physical therapists which were in excess of published limits. For all three years, the Intermediary made reductions in allowable interest expenses, and for fiscal year 1979, the Intermediary disallowed costs incurred in recruiting doctors for an independent clinic.

The plaintiff appealed these adjustments to the Provider Reimbursement Review Board (PRRB). 42 U.S.C. § 1395oo(a)(1)(A) (1982); 42 C.F.R. § 405.1835(a) (1982). The PRRB affirmed the Intermediary's adjustments in part, and modified them in part. Because the Deputy Administrator of the Health Care Financing Administration declined to reverse, affirm, or modify the PRRB's decision, it became the Secretary's final decision. *See* 42 U.S.C. § 1395oo(f)(1) (1982); 42 C.F.R. § 405.1871(b) (1982). The plaintiff appealed this decision to the district court. 42 U.S.C. § 1395oo(f)(1) (1982); 42 C.F.R. § 405.1877 (1982).

## II.

■ Our standard of review of this reimbursement decision has been established by the Administrative Procedure Act. 5 U.S.C. § 706 (1982). When reviewing administrative decisions, federal courts are authorized to set aside agency decisions only when they: are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; are contrary to constitutional right, power, privilege, or immunity; exceed statutory jurisdiction or fall short of statutory right; are reached in violation of established procedure; or are unsupported by substantial evidence. *Id.; St. Francis Hosp. Center v. Heckler,* 714 F.2d 872, 873 (7th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1274, 79 L.Ed.2d

679 (1984); *Pleasantview Convalescent & Nursing Center, Inc. v. Weinberger,* 565 F.2d 99, 102 (7th Cir.1976). We note also that the interpretations of regulations issued pursuant to a statute, especially a statute as complex as the Medicare Act, are entitled to considerable deference. *St. Francis Hosp. Center,* 714 F.2d at 873; *St. Mary of Nazareth Hosp. Center v. Department of Health & Human Servs.,* 698 F.2d 1337, 1346 (7th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983); *see Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

a. The disallowance of excess physical therapy costs.

■ In the 1977 and 1978 cost years, the plaintiff contracted with independent physical therapists to provide physical therapy services to its patients. For both of those fiscal years, the Intermediary disallowed those costs to the extent that they exceeded the "salary equivalency guidelines" published by the Secretary. On appeal, the plaintiff's argument is twofold: first, that the salary equivalency guidelines are "arbitrary, capricious, and an abuse of discretion" because they are based on invalid statistics; and, second, that the Secretary's denial of the plaintiff's request for an exception to the application of the guidelines was "clearly erroneous and not in accordance with the law."

When a provider of Medicare services enters into an independent contractor arrangement with a physical therapy service, both the Act and the regulations issued pursuant to it provide that the independent contractor shall not be paid more than the prevailing salary (plus any additional costs incurred by the provider for the benefit of the therapist) which a physical therapist who is an employee of a provider receives. 42 U.S.C. § 1395x(v)(5)(A) (1982); 42 C.F.R. § 405.432(a) (1982). The prevailing salary is "the hourly salary rate based on the 75th percentile of salary ranges paid by providers in the geographical area...." 42 C.F.R. § 405.432(b)(1) (1982). The Secre-

---

**1.** Blue Cross Association/Mutual Hospital Insurance, Inc.

tary relied on data gathered during a Bureau of Labor Statistics survey to determine the 75th percentile of salary ranges paid to physical therapists. *PRRB Decision No. 79–D8.* [1979–1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 29,628 at 9956, *rev'd, HCFA Administrator Decision* [1979–1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 29,703, *aff'd, Mercy Hosp. of Laredo v. Harris,* No. H–79–884 (S.D.Tx.1984) (appeal pending before the Fifth Circuit). This survey, conducted originally in 1972 but updated to reflect economic changes, gathered data from twenty-one standard metropolitan statistical areas (SMSAs). Nineteen SMSAs generated statistically significant data. *Id.* It is the application of the guidelines based on this data to which the plaintiff objects.

The plaintiff argues that guidelines based on data gathered from urban areas cannot be applied to rural areas. However, the Secretary's regulations do not require that the guidelines be applied in all situations or under all circumstances. The regulations provide for certain exceptions to the application of the guidelines, one of which applies to the plaintiff and is as follows:

An exception may be granted ... by the intermediary when a provider demonstrates that the cost for therapy services established by the guideline amounts are inappropriate to a particular provider because of some unique circumstances or

special labor market conditions in the area.

42 C.F.R. § 405.432(f)(2) (1982). Thus, it seems as if the guidelines were not intended to be an ironclad set of standards for making reimbursement decisions, but rather were intended to provide an approximate rule of thumb by which intermediaries could make those decisions. As is clear from the regulation setting forth the exception, the burden is on the provider to prove that, in its particular situation, the guidelines are not an appropriate rule of thumb. *Id.; see also Provider Reimbursement Man.,* Part 1, § 1414.2, *reprinted in* [1] Medicare & Medicaid Guide (CCH) ¶ 5849D–58. The Provider Reimbursement Manual elaborates on the exception procedure.[2] Once a provider establishes a prima facie case that the going rate for physical therapy or other services in the area is higher than the guidelines, the intermediary is to survey the other providers in the area to determine what the going rate is for the particular specialist. This survey should include similarly situated providers. Thus, the intermediary's ultimate decision as to the extent of the reasonable costs is made by assessing the applicant's costs vis-a-vis other providers in the relevant area, not on the guidelines. *Provider Reimbursement Man.,* Part 1, § 1414.2 *reprinted in* [1] Medicare & Medicaid Guide (CCH) ¶ 5849D–58 at 1931–48, 1931–49.

In this case, the district court found specifically that Bedford failed to present any

---

2. Section 1414.2 of the Provider Reimbursement Manual, Part 1, provides in pertinent part as follows:

In order to substantiate special labor market conditions, the provider must submit evidence enabling the intermediary to establish that the going rate in the area for this particular type of service is higher than the guideline limit and that such services are unavailable at the guideline amounts.... It is the duty of the provider to prove to the satisfaction of the intermediary that it has reasonably exhausted possible sources of this service without success....
....
... It is the responsibility of the intermediary to determine the rates that providers in the area generally have to pay therapists.... Once this information is collected, the inter-

mediary will then determine whether ... other providers in the area, in comparison to the provider requesting the exception, generally have to pay therapists ... higher rates than the guidelines....
....
... The key to an exception is not the rate requested for performing the particular type of service being evaluated, but the going rate for therapists ... performing these services, particularly salaried individuals, who are working in the area. If other providers in the area generally are able to obtain these services at rates that do not exceed the guidelines, an exception would not be appropriate.
*Provider Reimbursement Man.,* Part 1, § 1414.2, *reprinted in* [1] Medicare & Medicaid Guide (CCH) ¶ 5849D–58 at 1931–48, 1931–49.

evidence that other hospitals in the area were unable to obtain physical therapy services at rates within the guidelines for the cost years in question. On the other hand, the intermediary surveyed all of the hospitals within a thirty-five mile radius of the plaintiff—including a hospital of similar size in Bedford. Four of the five hospitals had hired therapists within the guidelines for the cost years in question. In addition, for the cost year following the years in question here, the plaintiff was able to hire a therapist at a rate well within the guidelines. The plaintiff argues, however, that it did present evidence that it and other providers were unable to obtain therapy services within the guidelines. This argument is disingenuous. The evidence which the plaintiff presented concerned cost years not in question here and, accordingly, is irrelevant.

The plaintiff urges us to find that the guidelines themselves, as well as the application of them, are arbitrary and capricious. The plaintiff has not shown the guidelines to be arbitrary and capricious. Pursuant to the exception procedure provided for in the guidelines, the intermediary determined the reasonableness of the plaintiff's physical therapy costs by determining what the going rate was for physical therapists in the plaintiff's area for the cost years in question. The guidelines were used only as a point of reference and not as an absolute limit on the plaintiff's reimbursable costs. Thus, the Secretary's decision was based on costs actually paid in the geographic area by other providers, and her decision to deny the plaintiff reimbursement for physical therapy costs in excess of the costs incurred by other providers in the area, and in excess of the guidelines, was not erroneous.

b. The modification of the plaintiff's reimbursable interest expense.

██ In 1976, the plaintiff executed a First Mortgage Note to the Hospital Authority of Lawrence County, Indiana, to finance a construction project. The Authority assigned the note to a bank, as trustee, and issued Hospital Revenue Bonds in the same amount as the note. The net proceeds of this bond, after retiring the existing debt, were placed into four funds established by the plaintiff under the terms of a bond indenture. One of these funds was a "debt service reserve fund" (DSRF). The DSRF was required as additional security for the lender, and was required to be large enough to pay one year of principal on the bonds. If the plaintiff did not default, the DSRF would be used to pay the final installment. Additional proceeds of the bonds were used to establish three funds, one of which was a construction fund for the payment of construction costs. The closing statement outlining the distribution of proceeds indicates that the plaintiff was to contribute $652,333.75 of its own money to the construction fund. The income earned on this money was not used to offset other interest expenses on Medicare cost reports because the money earning the income had belonged to the plaintiff.

The Intermediary had determined that the DSRF was not a funded depreciation account because its source was borrowed funds. Thus, the Intermediary concluded that income earned on the DSRF could be used to offset interest expenses. However, the PRRB reversed the Intermediary and found for the plaintiff on this issue. The PRRB concluded that the DSRF should be treated as funded depreciation, regardless of its source, because it was to be used for the capital purpose of paying off a mortgage principal. As a result, the income earned on the DSRF was not to be used to offset interest expenses. However, the PRRB went on to hold that the interest expense incurred in funding the DSRF was not reimbursable under the Medicare Act. The plaintiff argues that, while it was correct in deciding that the income earned on the DSRF should not be used to offset interest expenses, the PRRB's decision to disallow the interest expense on the borrowed money used to fund the DSRF was incorrect because the plaintiff easily could have taken the money it put into the construction fund and put it

in the DSRF instead. We recently considered and rejected a similar argument in *Memorial Hospital of Carbondale v. Heckler*, 760 F.2d 771 (7th Cir.1985).

In the *Memorial Hospital* case, the petitioners asked this court to interpret the regulations in a manner which would allow providers to treat the interest expense on borrowed funds used to fund a DSRF as an allowable cost, and to exempt from the offset rule the investment income earned on the DSRF. *Id.* at 17. We declined to adopt that approach and affirmed the Secretary's decision to disallow the interest expense on the borrowed money which funded the DSRF. *Id.* at 21.

For the time period relevant here, the Provider Reimbursement Manual provided as follows: "[w]hen a provider borrows money to make deposits of funded depreciation, interest paid by the provider on the money borrowed for this purpose is not allowable as cost." *Provider Reimbursement Man.*, Part 1, § 226.5, *reprinted in* [1] Medicare & Medicaid Guide ¶ 5159.01. Thus, it is clear that the Secretary correctly disallowed the interest expense the plaintiff incurred on the DSRF. *Memorial Hosp. of Carbondale*, 760 F.2d 779–782. However, the plaintiff argues that because it *could have* put the personal money it put into the construction fund into the DSRF: the income earned on the DSRF should be excluded from the offset rule; the income earned on the money the plaintiff contrib-

uted to the construction fund should be excluded from the offset rule; and the interest expense on the borrowed money in the DSRF should be a reimbursable cost.

This argument is unacceptable for the reasons which we articulated in *Memorial Hospital*,[3] 760 F.2d 781–782, and for the additional reason that the Secretary should not be required to trace a provider's funds to determine whether an allowance on interest expense would have been permissible *if* the provider had invested its money differently. *Cheshire Hosp. v. New Hampshire-Vermont Hosp. Serv., Inc.*, 689 F.2d 1112, 1124, 1126 (1st Cir.1982). The bond agreement specifically required that the plaintiff was to contribute $652,333.75 of its own money to the construction fund. We assume that decision was made for investment purposes, and neither we nor the Secretary should be required to ignore the terms of the bond agreement simply because the decision turned out to be less profitable than might have been supposed. Accordingly, we hold that the Secretary's decision to disallow as a Medicare expense the interest paid on the money borrowed to fund the DSRF was not arbitrary, capricious, or in violation of the law.[4]

c. The disallowance of costs incurred in recruiting physicians.

During the fiscal year ending September 30, 1979, the plaintiff spent approximately $16,000 in connection with recruit-

---

**3.** If we accepted the plaintiff's argument then, as we intimated in *Memorial Hospital*, the plaintiff would receive a windfall at the expense of Medicare rather than reimbursement for its reasonable costs. 760 F.2d 781–782. Further, the purpose behind the relevant regulations would be defeated. The regulations encourage funded depreciation in order to reduce the interest expense which Medicare must reimburse. *Id.* at 19–20; *Cheshire Hosp. v. New Hampshire-Vermont Hosp. Serv., Inc.*, 689 F.2d 1112, 1125 (1st Cir.1982), citing, *HCFA Dec. No. 77–D10*, [1977] Medicare & Medicaid Guide (CCH) ¶ 28,422 at 9497; *Sacred Heart Hosp. v. Heckler*, 601 F.Supp. 299, 302 (E.D.Pa.1984). *See* 42 C.F.R. § 405.415(e) (1982); 42 C.F.R. § 405.418(b) (1982). If the Secretary excluded the income earned from borrowed funds from the offset rule *and* allowed the interest paid on those funds as a Medicare expense, she would be

creating an incentive for providers to borrow. *Sacred Heart*, 601 F.Supp. at 302; *see also Cheshire*, 689 F.2d at 1125.

**4.** *St. Francis Community Hospital v. Schweiker*, [1984–2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 34,156 (D.S.C. Mar. 10, 1983), *aff'd mem.*, 725 F.2d 677 (4th Cir.1984) is not to the contrary. The question in that case was whether a provider had to reduce the balance of its funded depreciation account to zero—when a loan agreement with the Department of Health, Education, and Welfare required that a minimum balance be maintained—before it could be reimbursed for the interest expense on a loan incurred for and spent on capital assets. Unlike the case before us, the borrowed money was spent. Thus, no income was earned on the money. *Id.*, at 10, 186–10, 189.

ing physicians for Edgewood Clinic, Inc., an independent corporation which is neither owned nor operated by the plaintiff. Edgewood provided physicians for the plaintiff's house staff as well as twenty-four hour coverage of the plaintiff's emergency room. The Intermediary disallowed Medicare's proportion of these costs. The PRRB and the district court each affirmed that decision on the basis that the costs were not sufficiently related to the care of Medicare beneficiaries. We agree.

A Medicare provider is entitled to reimbursement for reasonable costs incurred in the production of services. 42 U.S.C. § 1395f(b) (1982); 42 C.F.R. § 405.402(a) (1982). However, there must be a relation between the costs incurred and the care of beneficiaries.

> The determination of [the] reasonable cost of services must be based on cost related to the care of beneficiaries.... Reasonable cost includes all necessary and proper expenses incurred in rendering services.... However, where the provider's operating costs include amounts not related to patient care ... such amounts will not be allowable.

42 C.F.R. § 405.451(c)(3) (1982). Apparently, the PRRB did not feel that the costs incurred in recruiting doctors for an independent corporation were sufficiently related to the care of Medicare beneficiaries to warrant reimbursement. We have no trouble sustaining that decision.

First of all, there is no indication that the expense was necessary, as is required by the regulations. *Id.* It was Edgewood's responsibility to provide house physicians and emergency room coverage to the plaintiff. Accordingly, one would expect Edgewood to recruit as well as hire competent physicians to fulfill its contractual obligations. Thus, there was no need for the plaintiff to incur this expense. Second, even if we could construe the expense as necessary, we think that the connection between recruiting doctors for an independent corporation and the actual care of beneficiaries is remote enough to warrant disallowance. Thus, the Secretary's deci-

sion to disallow reimbursement of this expense was not arbitrary and capricious.

We have reviewed each of plaintiff's arguments and have found them to be without merit. Accordingly, the district court's opinion is affirmed.