**ADVENTIST LIVING CENTERS, INC. d/b/a LaGrange Colonial Manor, Plaintiffs,**

**v.**

**Otis R. BOWEN, Secretary of the United States Department of Health and Human Services, and William L. Roper, Administrator of the Health Care Financing Administration, Defendants.**

**No. 87 C 2793.**

United States District Court, N.D. Illinois, E.D.

May 3, 1988.

Charles F. MacKelvie, Ross & Hardies, Chicago, Ill., for plaintiffs.

Elizabeth M. Landes, Asst. U.S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Adventist Living Centers, Inc. seeks review in this court of the decision of the Deputy Administrator of the Health Care Financing Administration pursuant to 42 U.S.C. § 1395oo. The parties have filed cross motions for summary judgment. For the following reasons, plaintiff's motion for summary judgment is DENIED; defendant's motion for summary judgment is GRANTED.

## BACKGROUND FACTS

The Medicare Program is a publicly financed health insurance program for the aged, the disabled, and patients with end-stage renal disease. The Health Care Financing Administration ("HFCA"), a division of the Department of Health and Human Services, is in charge of the Medicare Program. The day-to-day administration of the Medicare program is delegated to "fis-

cal intermediaries," such as Blue Cross/Blue Shield Association. Medicare reimburses "providers," such as hospitals and skilled nursing facilities, for the "reasonable costs" of providing health services. 42 U.S.C. § 1395f(b).

The Medicare provisions of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and its accompanying Regulations, specify the types of costs reimbursable by the Medicare program. The regulations specify that depreciation of specified assets is a reimbursable expense. 42 C.F.R. § 405.415 (1984).[1]

At the end of each fiscal year, each Medicare provider files a Cost Report with its fiscal intermediary. The intermediary reviews the Cost Report to ascertain whether the costs for which reimbursement has been made during the year were reimbursable. If the intermediary determines that any of the costs were not reimbursable, it notifies the provider of Cost Report adjustments.

On December 4, 1981 Adventist Living Centers, Inc. ("ALC")[2] entered into an agreement to purchase the business and assets of LaGrange Colonial Manor, a skilled nursing facility (the "Facility"), from Colianni & Dire, Inc., a Delaware corporation. The purchase price as set forth in the Real Estate Sales Contract was $2,537,500. Neither the contract nor the agreement to purchase allocated the purchase price of the Facility among the Facility's individual assets.

In its Cost Reports for the fiscal years ended December 31, 1982 and 1983, ALC included as reimbursable costs depreciation expenses in connection with the Facility's building and equipment, as permitted by Medicare Regulations. In completing its Cost Reports, ALC assigned a total cost basis of $2,542,000 to the assets based

upon their fair market value.[3] ALC relied on this cost basis to determine its depreciation expenses in 1982 and 1983.

Colianni filed its final Cost Report for the Facility in 1982. In preparing its Cost Report, Colianni hired C.A. Benson & Associates, Inc. ("Benson") to conduct a valuation of the assets. Colianni assigned values to the Facility's assets based upon the Benson Report.

Blue Cross/Blue Shield of Illinois is the fiscal intermediary for both Colianni and ALC. When checking ALC's Cost Reports at the end of fiscal 1982 and 1983, Blue Cross relied on Benson's valuation and Colianni's allocation of the asset values. Blue Cross adjusted ALC's Cost Reports to reflect the values in the Benson Report. Accordingly, Blue Cross reduced the amount of ALC's reimbursable depreciation expense by $12,017.00 for 1982 and $11,320.00 for 1983.

ALC appealed Blue Cross's adjustments to the Provider Reimbursement Review Board ("PRRB"), which held a hearing on August 6, 1986. The PRRB relied upon the "cost approach" in the Benson Report and held that the proper cost basis of the assets was $2,330,000. On January 15, 1987 the deputy Administrator of the HCFA (the "Secretary") reversed the decision of the PRRB and applied Benson's "market data approach." (A.R. 3–8). ALC now seeks judicial review of the Secretary's decision.

## DISCUSSION

The Administrative Procedure Act limits the scope of judicial review of a decision by the Secretary. *See* 42 U.S.C. § 1395oo (f)(1). Under the Administrative Procedure Act, a reviewing court may set aside only those agency actions, findings, and conclusions that are found to be arbitrary, capri-

---

1. At the time this dispute arose, the Medicare Regulations concerning depreciation were codified at 42 C.F.R. § 405.415 (1984). These regulations are currently codified at 42 C.F.R. § 413.134 (1986). References in this opinion are to the 1984 edition of the Regulations.

2. ALC is a Wisconsin not-for-profit corporation registered to do business in Illinois. ALC is affiliated with Adventist Health Systems North,

one of five corporate divisions of Adventist United States, a religious organization.

3. According to ALC, the $3,500.00 difference between the fair market value of the assets and the purchase price represented negative goodwill partially attributable to the fact that the Facility lost money during the last year prior to sale and for three years after the sale.

cious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence. *Daviess County Hospital v. Bowen,* 811 F.2d 338, 345 (7th Cir.1987); *Bedford Medical Center v. Heckler,* 766 F.2d 321, 323 (7th Cir.1985); 5 U.S.C. § 706(2)(A), (E). An administrative decision is supported by substantial evidence if there exists "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. Labor Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Graham Hospital Association v. Heckler,* 739 F.2d 285, 287 (7th Cir.1984).

The manner of calculating ALC's Medicare reimbursement is governed by the Medicare statute and its companion regulations. According to the Regulations, depreciation on buildings and equipment used in providing patient care is an allowable cost. 42 C.F.R. § 405.415(a). The Regulations provide that depreciation expense is based on the "historical cost" of the assets, which is the cost incurred by the present owner in acquiring the asset. 42 C.F.R. § 405.415(b)(1).

The Regulations contain special provisions governing the treatment of assets purchased as an ongoing operation by one Medicare provider from another. The purchaser of the assets must determine the cost basis of the new Facility in order to calculate depreciation expense for the first year. The Regulations provide that the cost basis of a Facility purchased after July 31, 1970 as an ongoing operation is the lowest of

1.  the total price paid for the Facility by the purchaser, as allocated to the individual assets; or

2.  the total fair market value of the Facility at the time of the sale, as allocated to the individual assets; or

3.  the combined fair market value of the individually identified assets at the time of sale.[4]

42 C.F.R. § 405.415(g)(1). In addition, the cost basis of the *depreciable* assets in such a Facility cannot "exceed the current reproduction cost depreciated on a straight line basis over the life of the assets to the time of the sale."[5] 42 C.F.R. § 405.415(g)(2). Thus, the purchaser's cost basis—and therefore his allowable depreciation cost—depends in part upon his allocation of purchase price to depreciable and nondepreciable assets.

In addition, the seller of the Facility must determine the proper allocation of the sales price to the individual assets in order to determine his gain or loss on the sale. The Regulations provide that the government may recoup any depreciation payments that are determined to be excessive in light of the gain from a subsequent sale of these assets. *See* 42 C.F.R. § 405.415(f)(1). The seller recognizes a gain on the sale to the extent that the amount of the purchase price allocated to depreciable assets exceeds the undepreciated historical cost of these assets. Thus, the seller's final Cost Report—and therefore the amount he must claim as a gain or loss on the sale—depends in part upon his allocation of the sales price to depreciable and nondepreciable assets.

The Secretary requires that the sale price used by the seller in computing gain or loss for his final Cost Report agree with the historical cost used by the purchasing provider in computing depreciation. (Prov. Reimb.Man., Part 1, § 104.14). However, the buying and selling providers have competing interests with regard to the allocation of the purchase price to the individual assets. The purchasing provider maximizes his allowable depreciation expense by allocating a *greater* proportion of the purchase price to depreciable (as opposed to nondepreciable) assets. On the other hand, the seller minimizes the amount of his gain on the sale of the Facility (and therefore the amount he must repay to Medicare) by allocating a *lesser* proportion of the selling

---

**4.** The third method of calculation is inapplicable because in this case the parties did not identify individual assets at the time of the sale.

**5.** "Current reproduction cost is the cost at current prices, in a particular locality or market area, of reproducing an item of property or a group of assets." 42 C.F.R. § 405.415(b)(6).

price to depreciable assets. The seller and buyer may therefore bargain for and agree upon the proper allocation. If, however, the parties cannot agree, the selling provider's intermediary must retain an independent appraisal expert to establish the fair market value of each asset and allocate the sales price according to the appraisal. 42 C.F.R. § 405.415(f)(2)(iv).

In this case, ALC and Colianni did not agree upon the allocation of the purchase price to depreciable and nondepreciable assets. (A.R. 73). Instead, Colianni hired Benson to value the assets and determine the allocation. (A.R. 209). Colianni apparently requested this appraisal in order to compile its final Medicare Cost Report and calculate its income taxes on the sale. *Id.*

▌ ALC contends that the Benson appraisal did not meet the Medicare appraisal guidelines. The Regulations require an appraisal to be conducted by an "independent appraisal expert," 42 C.F.R. § 405.415(f)(iv), but do not specify the qualifications of such an expert. The Secretary has defined an appraisal expert as an individual or firm with experience and expertise in appraising the historical cost, fair market value, or current reproduction cost of plant assets and who demonstrates "a knowledge and understanding of the regulations involving reimbursement principles, particularly those pertinent to depreciation." (Prov.Reimb.Man., Part 1, § 104.12).[6] The administrative record discloses that Ben Cavida, a Blue Cross representative, accepted Benson's report as meeting the Medicare guidelines and considered Mr. Benson to be an independent appraisal expert. (A.R. 209–210).[7] The PRRB and the Secretary likewise found that the Benson appraisal met the Medicare appraisal guidelines. (A.R. 30, 5). ALC argues that Benson was not independent

because he was hired by Colianni, and that Benson was not an expert because he had no knowledge of the Medicare Regulations.

This court cannot conclude that the Secretary's finding that Benson's appraisal met the requirements of the Medicare Regulations was unsupported by substantial evidence. ALC presented no evidence at the hearing which indicated that Benson was not independent of Colianni. Benson's appraisal, on its face, does not appear to favor Colianni. In fact, Benson's valuation of the Facility's assets resulted in an adjustment to Colianni's final Cost Report of nearly $640,000 (representing excess depreciation and gain on sale). (A.R. 360). Moreover, ALC has presented no evidence to this court which supports its allegation that Benson was connected to Colianni. The mere fact that Colianni hired Benson does not refute Benson's independence.

Nothing in the administrative record refutes the Secretary's conclusion that Benson was qualified to conduct a Medicare appraisal. David Felsenthal, President of Valuation Counselors, Inc., testified at the hearing that although he believed Mr. Benson to be an expert appraiser, he did not believe Mr. Benson had done "a lot of stuff for Medicare." (A.R. 199). However, he also testified that he had not seen Mr. Benson's qualifications. (A.R. 137). Nor was he aware of whether Mr. Benson had done appraisals for health care facilities. *Id.* No other evidence in the record supports ALC's allegation that Benson had never previously conducted an appraisal for Medicare purposes. Consequently, the Secretary's reliance on the intermediary's approval of the Benson appraisal is not refuted by the evidence.

▌ Nor is the court persuaded by ALC's assertion that use of the Benson appraisal "transgresses fundamental no-

---

6. Although the Provider Reimbursement Manual is not itself a Regulation, but rather is "best viewed as an administrative interpretation of the regulations and corresponding statute," the Seventh Circuit has noted that the Manual is entitled to "considerable deference" so long as it does not conflict with the plain meaning of a statute or Regulation. *Daviess*, 811 F.2d at 345; *Bedford Medical Center*, 766 F.2d at 323.

7. Mr. Cavida testified that he concluded that Benson was "independent" because he considered an independent appraiser to be one who exercises his expertise and judgment regardless of who pays him. (A.R. 217). Mr. Cavida further testified that he had no personal knowledge of whether Mr. Benson was familiar with the Medicare Regulations. (A.R. 214–215).

tions of fairness." (P's Reply at 7). ALC asserts that the Secretary's use of the appraisal was unfair because "Colianni has been allowed to impose a self-serving allocation on ALC without ALC being afforded an opportunity to voice dissent or protect its own interest." *Id.* The Regulations do not support ALC's assertion. The Regulations place the responsibility for requiring an independent appraisal on the *seller's intermediary* when the parties do not agree on an allocation. 42 C.F.R. § 405.415(f)(iv). The intermediary need not obtain the comments or approval of the buyer or the seller before accepting an appraisal report.

ALC also objects to the Benson appraisal on the grounds that the intermediary did not formally preapprove the proposal. The Secretary has stated that the provider seeking an appraisal "must inform its intermediary of its interest." (Prov.Reimb. Man., Part 1, § 134.1). The intermediary thereafter "must promptly determine if the firm qualifies as an independent expert, and whether the proposed appraisal meets program requirements regarding type, technique, and results." *Id.* In light of the fact that the intermediary subsequently approved the appraisal and the Secretary adopted the intermediary's approval, this

argument does not persuade the court to overturn the Secretary's decision. The failure of the intermediary to follow a minor procedural guideline does not render the Secretary's decision unsupported by substantial evidence or contrary to law.

Finally, the Secretary's conclusion that Benson's fair market value approach should be used as the basis for allocating the sale price to the individual assets is also supported by substantial evidence. The Secretary concluded that the limitation in Section 405.415(g)(2) applies only to depreciable assets. Therefore, the Secretary calculated ALC's cost basis as the lowest of the purchase price and fair market value.[8] ALC suggests that the Secretary should have combined Sections 405.-415(g)(1) and (2) and calculated ALC's cost basis as the lowest of the purchase price, fair market value, or current reproduction cost. However, the Secretary's determination that Section 405.415(g)(2) applies only to depreciable assets and therefore does not affect the cost basis of the assets in this case is a reasonable interpretation of the Regulations.[9] The Secretary's calculation of ALC's cost basis is not contrary to law and is supported by substantial evidence.[10]

8. The parties do not dispute that the purchase price of the facility was $2,537,500. Benson's appraisal valued the facility at $2,500,000 under a "market data," or fair market value, approach. According to 42 C.F.R. § 405.415(g)(1), therefore, ALC's cost basis is the lower of these, or $2,500,000.

9. Benson's allocation under the fair market value approach is as follows:

| | |
|---|---|
| Land | $ 535,000.00 |
| Building | $1,055,000.00 |
| Furniture, Fixtures, and Equipment | $ 300,000.00 |
| Business (or goodwill) | $ 610,000.00 |
| Total | $2,500,000.00 |

(A.R. 423).
Benson's allocation under the current reproduction cost approach is as follows:

| | |
|---|---|
| Land | $ 535,000.00 |
| Building | $1,450,000.00 |
| Land improvements | $ 45,000.00 |
| Furnishings, Fixtures and Equipment | $ 300,000.00 |
| Goodwill | $ 187,500.00 |
| Total | $2,350,000.00 |

(A.R. 414). Of these individual assets, only "building" and "furniture, fixtures, and equipment" are depreciable assets. Thus, the cost basis of these assets is the lower of their fair market value or their current reproduction cost. Since the current reproduction cost of these assets exceeds their fair market value, the Secretary was correct to conclude that the current reproduction cost was inapplicable in this case.

10. The court is not persuaded by ALC's contention that the Secretary should have allocated no portion of the purchase price of the Facility to goodwill. As ALC concedes, the term "goodwill" denotes the excess of the sale price of the Facility over the fair market value of the assets involved in the sale. *Gosman v. United States,* 573 F.2d 31, 37 n. 8 (Ct.Cl.1978). Under this definition, the goodwill in this transaction totalled $647,500. Benson's allocation of $610,000 to goodwill is *less* than the "plug figure" which ALC recommends. Even under ALC's definition of goodwill, the Secretary's allowance of goodwill was not contrary to law.

After considering the evidence before the Secretary and evaluating his decision in this case, it appears that the Secretary's determination of ALC's cost basis for the purchase of the Facility in question is supported by substantial evidence and is not contrary to law. Consequently, the decision of the Secretary is affirmed.

## CONCLUSION

For all the foregoing reasons, the decision of the Secretary is affirmed. Plaintiff's motion for summary judgment is DENIED; the Secretary's motion for summary judgment is GRANTED.