COURT OF APPEALS OF VIRGINIA


Present: Judges Frank, McClanahan and Petty
Argued at Richmond, Virginia


AVANTE AT ROANOKE,
  AVANTE AT LYNCHBURG,
  AVANTE AT WAYNESBORO AND
  AVANTE AT HARRISONBURG

v.     Record No. 2869-08-3

PATRICK W. FINNERTY, DIRECTOR
  VIRGINIA DEPARTMENT OF
  MEDICAL ASSISTANCE SERVICES

OPINION BY
JUDGE ELIZABETH A. McCLANAHAN
MAY 4, 2010


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Jonathan M. Apgar, Judge

Susan A. Turner (James P. Holloway; Ober Kaler Grimes & Shriver,
PC, on briefs), for appellants.

Allen T. Wilson, Senior Assistant Attorney General (William C.
Mims, Attorney General; David E. Johnson, Deputy Attorney
General; Kim F. Piner, Senior Assistant Attorney General, on
brief), for appellee.


In this administrative appeal, four affiliated nursing home facilities, Avante at Roanoke,

Avante at Lynchburg, Avante at Waynesboro, and Avante at Harrisonburg (collectively

"Avante"[1]), appeal the circuit court's affirmance of two related decisions of the Virginia

Department of Medical Assistance Services ("DMAS"), the state agency responsible for

administering Virginia's Medicaid program. In those decisions, DMAS denied Avante's claims

for additional reimbursement of costs (in the form of year-end settlement adjustments) for

respiratory therapy services rendered to Medicaid eligible patients over a two-year period.

---

[1] At all relevant times, Avante Group, Inc., a Florida corporation, owned and operated the
four nursing home facilities.

Because of DMAS's erroneous interpretation and application of certain governing state and federal regulations, we agree with Avante that DMAS made errors of law in adjudicating Avante's claims. We thus reverse the circuit court in affirming DMAS's decisions, and remand the case to the circuit court with instructions to remand to DMAS for reconsideration.

I.

Avante, as a Medicaid services provider, established in the mid-1990's specialized care units at its four Virginia nursing facilities, located in Roanoke, Lynchburg, Waynesboro, and Harrisonburg, for the treatment of, among others, ventilator and tracheostomy dependent patients who were eligible for Medicaid benefits. See 12 VAC 30-60-40(H) and 12 VAC 30-60-320 (setting forth Medicaid criteria for "ventilation/tracheostomy specialized care"). Those patients "require[d] comprehensive respiratory therapy services" as part of their specialized care. 12 VAC 30-60-320(B). Avante contracted with the University of Virginia Medical Center to perform the respiratory therapy services. See 42 C.F.R § 413.106 (regulating cost reimbursements to nursing facilities for Medicare and Medicaid specialized care services provided "under arrangements" with outside entities). Avante received reimbursement for the cost of the services from DMAS, through its administration of the Medicaid program in Virginia. See Code § 32.1-325 (establishing DMAS as the agency in Virginia to administer the Medicaid program). [2]

The University of Virginia Medical Center eventually stopped performing respiratory therapy services for patients at nursing facilities under the Medicaid program, at which time Avante began performing the services "in-house," managing "the program on [its] own." After a

---

[2] See also Fralin v. Kozlowski, 18 Va. App. 697, 699, 447 S.E.2d 238, 239 (1994) (explaining that "[t]he Virginia Medicaid program is authorized under the federal Medicare statute," and "is governed by a comprehensive statutory scheme structured to reimburse reasonable costs incurred by qualified providers of health services to Medicare and Medicaid patients").

year of doing so, Avante, in 2001, again contracted with an outside entity, Southern Healthcare Services ("Southern"), to perform the respiratory therapy services for Avante's Medicaid eligible ventilator and tracheostomy dependent patients. This arrangement with Southern extended for at least the next two fiscal years ending May 31, 2002 (FY 2002) and May 31, 2003 (FY 2003), which are the two years in dispute in this appeal.

The respiratory therapy services provided to Avante's above-referenced Medicaid eligible patients fell within the definition of "ancillary services" under the Medicaid payment system for nursing facilities. 12 VAC 30-90-264. The costs of those services were, in turn, categorized as "[s]pecialized care ancillary costs." Id. Therefore, to the extent Avante's costs for providing those services were "reasonable," Avante was entitled to payment from DMAS for the costs "on a pass-through basis." Id. That is, there was no pre-determined annual "ceiling" or limitation on the total actual costs that were subject to reimbursement (unlike, for example, certain Medicaid reimbursement limits for Avante's "routine operating costs"). Id. DMAS paid Avante for the costs of such ancillary services under a prospective payment system. Under that system, DMAS would pay a provider like Avante an "interim rate" or per diem throughout the current year based on the provider's actual "settled" costs for the services in the previous year, and at the end of the current year DMAS would determine what "settle[ment]" was required between it and the provider after reconciling the per diem payments with the provider's actual costs incurred in the current year.[3] Id.

In FY 2002, DMAS thus paid to Avante a per diem throughout the year for the respiratory therapy services provided to Avante's Medicaid eligible ventilator and tracheostomy

---

[3] The terms "settled" and "settlement" in reference to costs in this context do not denote an agreement between DMAS and the provider, but rather DMAS's own determination as to whether a provider was underpaid or overpaid for the costs of the services provided in the fiscal year under review.

dependent patients based on DMAS's payment to Avante for the costs of such services in the previous year (FY 2001). [4]  At the end of FY 2002, Avante submitted to DMAS, as required, annual cost reports setting forth, *inter alia*, the actual costs it incurred for those respiratory therapy services in FY 2002—services provided to Avante's patients through its first year contract with Southern. See 12 VAC 30-90-70.  Avante indicated in the reports that it had been underpaid for the services, as established by comparing the total of its actual costs for FY 2002 to the total of its interim per diem payments received in FY 2002.  Avante's actual costs for the respiratory therapy services in FY 2002 were, in fact, substantially more than its costs "as settled" for the services in the previous year—the year Avante provided the services through its own employees.  Accordingly, Avante further indicated in the FY 2002 cost reports that it was claiming, as part of its year-end settlement with DMAS, reimbursement in the amount of its underpayment for the actual costs of the respiratory therapy services incurred in FY 2002.

In the next step of this "cost settlement process," DMAS evaluated Avante's cost reports, conducted an audit, and decided that Avante's actual costs in FY 2002 for the respiratory therapy services were not reasonable. See 12 VAC 30-90-20; 12 VAC 30-90-70; 12 VAC 30-90-120. Having reached that decision, DMAS determined Avante's reimbursable costs for those services by calculating a "per patient/per day allowance" based on Avante's FY 2001 settled costs.  As a result of this calculation, which became the basis of DMAS's FY 2002 cost settlement for Avante, Avante's reimbursable costs were much less than the actual costs it incurred that year in providing the services to its Medicaid patients under its contract with Southern.

Avante pursued its claim for additional Medicaid reimbursement for the costs of its respiratory therapy services provided in FY 2002 by challenging DMAS's FY 2002 cost

---

[4] At that time, DMAS was, of course, paying Avante for the provision of numerous other Medicaid services, as a Medicaid nursing facility provider at each of its four Virginia locations.

- 4 -

settlement in an administrative appeal.  Following a formal administrative hearing, DMAS issued a final agency decision dated June 30, 2004, rejecting Avante's claim.

The subsequent FY 2003 cost settlement process between DMAS and Avante was essentially the same, both procedurally and substantively, as the process had been for FY 2002. The total of the per diem paid by DMAS to Avante in FY 2003 for the respiratory therapy services provided that year to Avante's Medicaid eligible ventilator and tracheostomy dependent patients—through Avante's second year contract with Southern—was much less than Avante's actual costs for providing the services.  After Avante made a claim for the difference, as reflected in its FY 2003 cost reports, DMAS again decided that Avante's actual costs for the services were not reasonable, and determined Avante's reimbursable costs for those services by calculating a "per patient/per day allowance" based on Avante's FY 2001 settled costs.  DMAS's FY 2003 cost settlement for Avante thus again resulted in Medicaid cost reimbursement to Avante for respiratory therapy services that was substantially below Avante's actual costs for providing the services in FY 2003.  Avante sought additional reimbursement from DMAS through another administrative appeal, and, again, following a formal administrative hearing, DMAS rejected Avante's claim in a final agency decision dated December 2, 2005.

Avante appealed to the circuit court DMAS's final agency decisions on Avante's respective FY 2002 and FY 2003 claims for additional Medicaid reimbursement for the costs of its respiratory therapy services.  The two appeals were eventually consolidated for consideration because of the similarity of the issues presented.  By letter opinion dated November 5, 2008, the court denied Avante's claims.  The court then "sustained" DMAS's two agency decisions and dismissed Avante's appeals by final order entered on December 2, 2008.

This appeal followed.

II.

The Virginia Administrative Process Act authorizes judicial review of agency decisions. See Code § 2.2-4027. Under well established principles governing the appeal of such decisions, "the burden is upon the appealing party to demonstrate error." Carter v. Gordon, 28 Va. App. 133, 141, 502 S.E.2d 697, 700-01 (1998). Our review is limited to determining (1) "[w]hether the agency acted in accordance with law;" (2) "[w]hether the agency made a procedural error which was not harmless error;" and (3) "[w]hether the agency had sufficient evidential support for its findings of fact." Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988). Further, with regard to claims of regulatory interpretive error, we are to "give 'great deference' to an agency's interpretation of its own regulations." Bd. of Supervisors v. State Bldg. Code Tech. Review Bd., 52 Va. App. 460, 466, 663 S.E.2d 571, 574 (2008). "This deference stems from Code § 2.2-4027, which requires that reviewing courts 'take due account' of the 'experience and specialized competence of the agency' promulgating the regulation." Id. (quoting Real Estate Bd. v. Clay, 9 Va. App. 152, 160-61, 384 S.E.2d 622, 627 (1989)). However, "'deference is not abdication, and it requires us to accept only those principles of agency interpretations that are reasonable in light of the principles of construction courts normally employ.'" Id. (quoting EEOC v. Arabian American Oil Co., 499 U.S. 244, 260 (1991)). See also Avalon Assisted Living Facilities v. Zager, 39 Va. App. 484, 503, 574 S.E.2d 298, 307 (2002) (principles of statutory construction apply with equal force "to the interpretation of regulations adopted by an administrative agency").

Avante argues on appeal that DMAS erroneously interpreted and applied both state and federal regulations in reaching the conclusion in DMAS's two final agency decisions that Avante's costs for the subject respiratory therapy services in FY 2002 and FY 2003 were not reasonable, and in thus rejecting Avante's claims for additional Medicaid cost reimbursements.

Avante further argues that the circuit court, in denying Avante's request to set aside DMAS's decisions, failed to recognize those errors, erroneously limiting its review, instead, to whether the decisions were substantially supported by the evidence in the record. We agree with Avante that DMAS erred in its interpretation and application of governing state and federal regulations in its two final agency decisions and that the circuit court erroneously failed in its review of DMAS's adjudication of Avante's claims to recognize those errors and remand the case to DMAS for reconsideration. [5]

A.

Avante's Utilization of Respiratory Therapists

In support of its claims for additional Medicaid cost reimbursements for FY 2002 and FY 2003, Avante presented evidence at the evidentiary hearings addressing the reasonableness of its costs for the respiratory therapy services provided to its Medicaid eligible ventilator and tracheostomy dependent patients for each of those two years. Avante's representatives testified that, in an effort to obtain a niche in the market, at the beginning of FY 2002 Avante started taking not only additional Medicaid eligible ventilator and tracheostomy dependent patients, but also greater numbers of such patients with more acute conditions. Avante's representatives further testified that in order to provide the necessary respiratory therapy services to those patients Avante needed to contract with an outside entity possessing a higher level of expertise in the field of respiratory therapy than that possessed by Avante's own employees. That was the reason, Avante's witnesses explained, for Avante's contract with Southern to perform those services in FY 2002 and FY 2003.

---

[5] Because of our rulings on Avante's arguments regarding those errors of law and remand of this case for reconsideration, we need not address Avante's other arguments that DMAS's decisions were not supported by substantial evidence and that the circuit court erred in holding to the contrary.

Avante's representatives also asserted that, pursuant to DMAS's regulations and Nursing Home Manual, respiratory therapists (furnished by Southern), as opposed to Avante's nurses, were required to and did, in fact, perform all of the respiratory therapy services for Avante's subject Medicaid patients and that respiratory therapists were required to be on the premises twenty-four hours a day for at least the benefit of the ventilator dependent patients. Thus, according to Avante, the increase at its facilities of both the number of patients and the level of respiratory therapy services reasonably accounted for a significant part of its increased costs for the services in FY 2002 and FY 2003.

In response, DMAS took the position, which was ultimately adopted in both final agency decisions, that its regulations did not require that all respiratory therapy services in a specialized care unit be performed by respiratory therapists. It was sufficient to have nurses provide respiratory therapy care in addition to respiratory therapists, so long as a respiratory therapist remained available, as defined by being "on call" twenty-four hours a day. As DMAS's Medicaid Settlement Reimbursement Manager, James Branham, testified, "[j]ust a nurse is required to be on site twenty-four [hours a day]—a respiratory therapist has to be available on a twenty-four hour basis." By "available," he meant "on call availability." Branham also testified, however, in response to questioning by the administrative hearing officer in the appeal of Avante's FY 2003 claim, that if Avante was required to have a respiratory therapist on site "24/7," then he assumed that "would change the numbers," referring to DMAS's cost settlement with Avante.

The regulations at issue are 12 VAC 30-60-40 and 12 VAC 30-60-320. At all relevant times, 12 VAC 30-60-40 provided in relevant part as follows:

H. Specialized care services.

* * * * * * *

2. Providers must be able to provide the following specialized services to Medicaid specialized care recipients:

* * * * * * *

b. Skilled nursing services by a registered nurse *available 24 hours a day*;

* * * * * * *

h. Respiratory therapy services by a board-certified therapist (for ventilator patients, these services must be *available 24 hours per day*) . . . .

(Emphasis added.)

Setting forth the specialized care criteria for the Medicaid patient, 12 VAC 30-60-320 provided, among other things, that the patient had to meet at least one of several specifically listed alternative requirements. Two of the alternative requirements were (i) that the patient needed "special equipment such as mechanical ventilators, respiratory therapy equipment (that has to be supervised by [a] licensed nurse *or* respiratory therapist)," or (ii) that the patient needed "[d]aily respiratory therapy treatments that must be provided by a skilled nurse *or* respiratory therapist." 12 VAC 30-60-320 § 2.2(B)(2) and (B)(3)(d) (emphasis added).

In addition, Avante pointed to language from DMAS's Nursing Home Manual providing that the "[r]espiratory therapy services must be of a level of complexity and sophistication or the condition of the resident shall be of such a nature that the services can only be performed by a respiratory therapist who is certified by the Board of Medicine." DMAS Nursing Home Manual, Chapter VI at 56 (page revision date: January 1, 2001).

DMAS, on the other hand, relied on language from the same section of the Nursing Home Manual, which provided as follows:

- 9 -

> If the nursing home agrees to provide care to a resident who is dependent on mechanical assistance for respiration (positive or negative pressure mechanical ventilators), respiratory therapy services must be available 24 hours daily. If the nursing home contracts for respiratory therapy services, a respiratory therapist must be on call 24 hours a day and available to the home in a timely manner.

Id.

Avante and DMAS advance the same arguments in this Court as they did throughout both of Avante's administrative appeals below. Viewing 12 VAC 30-60-40 and 12 VAC 30-60-320 as part of the same regulatory scheme, we agree with DMAS that these regulations, read in conjunction, plainly contemplated the provision of respiratory therapy services by both nurses and respiratory therapists. Thus, DMAS was correct in rejecting Avante's position that all of those services had to be provided only by respiratory therapists. Indeed, 12 VAC 30-60-320 § 2.2(B) expressly indicated that at least some of the services could be provided by a "nurse *or* respiratory therapist." (Emphasis added.)

We also conclude, however, that DMAS erred in deciding that no respiratory therapist was required to be on the premises on a twenty-four-hour basis at each of Avante's nursing facilities, so long as each facility had a respiratory therapist "on call." Neither 12 VAC 30-60-40 nor 12 VAC 30-60-320 made any reference to a respiratory therapist being "on call." Rather, in setting forth the specialized care criteria for a nursing facility, 12 VAC 30-60-40 specifically stated that the nursing facility was required to provide "[s]killed nursing services by a registered nurse *available 24 hours a day*;" and, "for ventilator patients," the facility was required to provide "[r]espiratory therapy services by a board-certified therapist . . . *available 24 hours per day*." (Emphasis added.) The required availability of nurses and respiratory therapists, where ventilator patients were concerned, was thus exactly the same under the express terms of this regulation.

- 10 -

As we stated in Board of Supervisors, 52 Va. App. at 466-67, 663 S.E.2d at 574 (quoting

Christensen v. Harris County, 529 U.S. 576, 588 (2000)),

> [n]o matter how one calibrates judicial deference, the
> administrative power to interpret a regulation does not include the
> power to rewrite it. When a regulation is "not ambiguous,"
> judicial deference "to the agency's position would be to permit the
> agency, under the guise of interpreting a regulation, to create *de
> facto* a new regulation."

See also Dep't of Med. Assistance Servs. v. Beverly Healthcare of Fredericksburg, 41 Va. App.

468, 483-84, 585 S.E.2d 858, 866-67 (2003) (rejecting DMAS interpretation contrary to "plain

language of the regulation"); Smith v. Liberty Nursing Home, Inc., 31 Va. App. 281, 296-97,

522 S.E.2d 890, 897 (2000) (same).

In regard to the DMAS Nursing Home Manual, it is similar to the federal Medicare

Provider Reimbursement Manual, which we have described as "an interpretive guideline

designed to facilitate the management of reimbursement under the Medicare Program." Fralin v.

Kozlowski, 18 Va. App. 697, 699, 447 S.E.2d 238, 240 (1994). But the Nursing Home Manual,

like the Medicare Provider Reimbursement Manual, "does not have the binding effect of law or

regulation." Id. at 699 n.2, 447 S.E.2d at 240 n.2 (determining the "legal status" of the PRM)

(citation and internal quotation marks omitted). Accordingly, to the extent the Nursing Home

Manual can be read as contrary to our above-stated construction of 12 VAC 30-60-40 and 12

VAC 30-60-320, those provisions of the manual have no legal effect. See Maximum Home

Health Care, Inc. v. Shalala, 272 F.3d 318, 321 (6th Cir. 2001) ("Where an administrative agency

creates manual provisions that are inconsistent with the governing regulations, it creates for itself

a kind of open-ended discretion in its administrative investigations, and opens the door to

disparate treatment of interested parties.").

We therefore hold that, pursuant to 12 VAC 30-60-40, Avante was required, as a matter

of law, to have one or more respiratory therapists on site twenty-four hours a day at each of its

- 11 -

nursing facilities' specialized care units engaged in the care of Medicaid eligible ventilator patients. [6]

B.

Avante's Payment of Salary Equivalency Rate under 42 C.F.R § 413.106

Under Avante's contract with Southern to furnish the respiratory therapists that performed the subject respiratory therapy services at Avante's four nursing facilities, Avante paid Southern for the services at the "salary equivalency" rate ("SER") established under 42 C.F.R § 413.106.[7] This federal regulation, addressing the cost of a provider's services furnished "under arrangements" with an outside entity, is part of the Medicare reimbursement regulatory scheme that governs certain aspects of Medicaid reimbursement in Virginia. See 12 VAC 30-90-20 (providing that, except where specifically modified in the DMAS regulations, "Medicare principles of reimbursement, as amended from time to time, shall be used to establish the allowable costs in the rate calculations"). On strictly an hourly basis, the SER was significantly higher than the wages Avante paid to its own respiratory therapists in FY 2001 when it was providing the respiratory therapy services "in-house." The SER was also significantly higher than the hourly wages paid to the "in-house" respiratory therapists at two other nursing facilities in the northern Virginia area to which DMAS compared Avante's costs for respiratory therapy services.

---

[6] We are not ruling, however, upon the *actual* number of respiratory therapists that should have been present at each of Avante's specialized care units during each twenty-four-hour period based on the actual patient population. Such a ruling would involve, *inter alia*, a review of medical standards of care applicable to the particular number and mix of both ventilator and tracheostomy dependent patients at each of the units. See 12 VAC 30-60-40(A). Only limited evidence was presented on that issue in Avante's two formal evidentiary hearings. Thus, in light of our construction of 12 VAC 30-60-40 and 12 VAC 30-60-320, and remand of this case to DMAS for reconsideration, DMAS may desire to receive additional evidence on this medical issue as it relates to Avante's reimbursement of costs. See Code § 2.2-4029.

[7] The regulation, in pertinent part, is the same as it was at all times relevant to this case.

Avante has argued throughout this appeal that the SER paid to Southern was reasonable *per se* and that Avante was thus entitled to Medicaid reimbursement of costs based on that rate. DMAS has rejected this argument, asserting that Avante failed to prove that paying the SER to Southern was reasonable. As summarized in the final agency decision in Avante's appeal of DMAS's FY 2003 cost settlement, DMAS's director stated:

> Avante argues that it is entitled to the disputed payments because it "paid no more than the salary equivalency for its outside respiratory therapy services" and that because the salary equivalency represents "the fair market rate for those services," it has proven its entitlement to the disputed payments. In essence, Avante argues that because it has claimed no more than the highest salary equivalency amount allowed under DMAS' payment policy (DMAS uses Medicare's salary equivalency guidelines to cap what it will pay on an hourly basis for out-sourced specialized services), its costs are *per se* reasonable. However, Avante has made no showing that it was unable or even tried to purchase respiratory therapist services at anything but the highest level permitted under the guideline. Under Medicare and Medicaid's "prudent buyer" principle, it was incumbent upon Avante to make such a showing. See Provider Reimbursement Manual, CM-Pub 15-1, § 2103. Clearly, it did not. While a fair market rate may, in some circumstances, be equal to the cap, in others it may not. Applying the logic of Avante's argument, a payment cap becomes a payment entitlement. However, because Avante did not demonstrate that payment at the cap (the salary equivalency) was both necessary and reasonable, Avante's argument fails.

We agree with Avante to the extent Avante argues that it was reasonable, as a matter of law, for Avante to use the SER to pay Southern for respiratory therapists pursuant to 42 C.F.R § 413.106.

Under 42 C.F.R § 413.106(a),

> [t]he reasonable cost of the services of . . . therapists [including respiratory therapists] . . . furnished under arrangements . . . with a provider of services . . . may not exceed an amount *equivalent to the prevailing salary and additional costs* that would reasonably have been incurred by the provider or other organization had such services been performed *by such person in an employment relationship*, plus the costs of *other reasonable expenses* incurred by such person in furnishing services under such an arrangement.

- 13 -

(Emphasis added).  The "prevailing salary" is defined as "the hourly salary based on the 75th percentile of salary ranges paid by providers in the geographical area, by type of therapy, to therapists working full time in an employment relationship."  42 C.F.R § 413.106(b)(1).  The prevailing hourly salary is then adjusted by adding the "standard fringe benefit and expense factor," as defined in subsection (b)(2) of the regulation,[8] which together produces an "adjusted hourly salary equivalency," and "[t]his amount is determined on a periodic basis for appropriate geographical areas."  42 C.F.R § 413.106(b)(3).  A "standard travel allowance" is also accounted for, "in addition to the adjusted hourly salary equivalency amount."  42 C.F.R § 413.106(b)(4).

The SER guidelines "are the amounts published by [the Centers for Medicare and Medicaid Services, an agency within the United States Department of Health and Human Services] reflecting the application of [42 C.F.R § 413.106(b)(1) through (b)(4), as described above] to an individual therapy service and a geographical area."  42 C.F.R § 413.106(b)(6).[9]  The regulation then provides in subsection (c):  "*Until* a guideline is issued for a specific therapy

---

[8] The "fringe benefit and expense factor" is defined as

> an amount that takes account of fringe benefits, such as vacation pay, insurance premiums, pension payments, allowances for job-related training, meals, etc., generally received by an employee therapist, as well as expenses, such as maintaining an office, appropriate insurance, etc., an individual not working as an employee might incur in furnishing services under arrangements.

42 C.F.R § 413.106(b)(2).

[9] Consequently, when one compares the SER to the "in-house" cost of a therapist on strictly an hourly basis at the market rate, the SER will by definition be significantly higher; but that amounts to comparing the proverbial "apples to oranges," as DMAS's Medicaid Settlement Reimbursement Manager, James Branham, acknowledged during his testimony.  Only after applying the fringe benefits and other expenses to the in-house hourly wage, as are factored into the SER, is there something close to an "apples to apples" comparison—thusly explaining the use of the term "salary *equivalency*" rate in describing the rates set forth in the federal guidelines.  42 C.F.R § 413.106 (emphasis added).  Accordingly, Branham further acknowledged in his testimony that the SER was "reasonably comparable to in-house services when you combine the elements of benefits and overhead associated with the service."

- 14 -

or discipline, costs are evaluated so that such costs do not exceed what a prudent and cost-conscious buyer would pay for the given service." 42 C.F.R § 413.106(c)(6) (emphasis added). The plain import of this language is that, once a guideline amount has been established by the Centers for Medicare and Medicaid Services for a specific therapy, it supplants an agency's regulatory authority to require a provider to prove that paying the SER to an outside entity for the particular service was prudent. See New Jersey Speech-Language-Hearing Ass'n v. Prudential Ins. Co. of America, 551 F. Supp. 1024, 1027 (D.N.J. 1982) (holding that, because SER guidelines had "not yet [been] issued for occupational therapy and speech therapy services" pursuant to the predecessor to 42 C.F.R § 413.106, the intermediaries were "therefore required to use the 'prudent buyer principle' to determine the reasonableness of expenditures for speech therapy provided under arrangement"). DMAS has cited no authority holding otherwise, nor have we found any. Because the SER for respiratory therapists in Virginia had been issued by the Centers for Medicare and Medicaid Services for all times relevant to this appeal, Avante's use of that rate to pay Southern for those services was thus reasonable *per se*, as Avante asserts.

Our reading of the relevant provisions of 42 C.F.R § 413.106 is reinforced by the fact that there is no mechanism in the regulation for requiring a provider to prove it acted prudently (and thus reasonably) in paying the SER to an outside entity for therapy services; yet, there is a procedure in the regulation under which a provider may demonstrate, based on "unique circumstances or special labor market conditions," that "the costs for therapy services established by the [SER] guideline amounts are *inappropriate* to [that] particular provider." 42 C.F.R § 413.106(f)(1) (emphasis added); see Grancare, Inc. v. Shalala, 93 F. Supp. 2d 24, 30 (D.D.C. 2000) ("A provider could escape application of a limit imposed by a [SER] guideline only by demonstrating, in a trial-like proceeding, the existence of unusual circumstances that resulted in an efficient provider incurring costs above the standard payment rate." (citing 42 C.F.R

§ 413.106(f)).  As explained in <u>Bedford Med. Ctr. v. Heckler</u>, 766 F.2d 321 (7th Cir. 1985),

under this "exception" to the application of the SER guideline amounts:

> Once a provider establishes a prima facie case that the going rate for [the particular] therapy or other services in the area is higher than the guidelines, the intermediary is to survey the other providers in the area to determine what the going rate is for the particular specialist.  This survey should include similarly situated providers.  Thus, the intermediary's ultimate decision as to the extent of the reasonable costs is made by assessing the applicant's costs vis-à-vis other providers in the relevant area, not on the guidelines.

<u>Id.</u> at 324 (citing Provider Reimbursement Manual, Part 1, § 1414.2).  No such survey is

authorized under 42 C.F.R § 413.106(f)(1), or addressed in the Provider Reimbursement Manual,

for use as a basis of supporting a government agency's decision to reject the SER as a reasonable

cost for therapy services obtained by a provider "under arrangement" with an outsider entity, i.e.,

rejection of the SER because it was purportedly too high, rather than too low.  DMAS therefore

erred in using its survey of the two nursing facilities in the northern Virginia area for that

purpose.

DMAS, moreover, ultimately erred in its interpretation and application of 42 C.F.R

§ 413.106 by concluding in its final agency decisions that Avante's use of the SER to pay

Southern for those services was not reasonable *per se* and that Avante was, therefore, not entitled

to Medicaid cost reimbursements based on the SER in DMAS's FY 2002 and FY 2003 cost

settlements.  <u>See</u> <u>General Elec. Co. v. United States EPA</u>, 53 F.3d 1324, 1330 (D.C. Cir. 1995)

(explaining that a government agency's "interpretation is entitled to deference, but if it wishes to

use that interpretation to cut off a party's right, it must give full notice of its interpretation").

However, while Avante was entitled to cost reimbursements for the respiratory therapists

furnished by Southern based on the SER, as evidenced by our holding under subsection II.A.

above, this was true only so far as Avante's utilization of those therapists in its specialized care units was proper.

III.

For the reasons stated above, we reverse the circuit court's affirmance of DMAS's final agency decisions denying Avante's claims for additional Medicaid cost reimbursements for FY 2002 and FY 2003, and remand the case to the circuit court with instructions to return the case to DMAS for reconsideration of its decisions consistent with this opinion.

<u>Reversed and remanded.</u>