COURT OF APPEALS OF VIRGINIA


Present: Judges Elder, Annunziata and Clements
Argued at Richmond, Virginia


DEPARTMENT OF MEDICAL ASSISTANCE SERVICES

                                        OPINION BY
v.    Record No. 0802-02-2        JUDGE JEAN HARRISON CLEMENTS
                                        SEPTEMBER 9, 2003
BEVERLY HEALTHCARE OF FREDERICKSBURG,
 CARRIAGE HILL NURSING HOME,
 HERITAGE HALL-FRONT ROYAL,
 HERITAGE HALL-KING GEORGE,
 LYNN CARE CENTER,
 OAK SPRINGS OF WARRENTON,
 ROSE HILL NURSING HOME AND
 WARRENTON OVERLOOK HEALTH &
 REHABILITATION


            FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
                   William H. Ledbetter, Jr., Judge

            Paige S. Fitzgerald, Assistant Attorney
            General (Jerry W. Kilgore, Attorney General;
            Francis S. Ferguson, Deputy Attorney General;
            Siran S. Faulders, Senior Assistant Attorney
            General, on briefs), for appellant.

            Thomas W. McCandlish (Dominic P. Madigan;
            McCandlish Holton, PC, on brief), for
            appellees.


     This appeal arises from an order of the Circuit Court of

Spotsylvania County (circuit court) reversing the ruling of the

Director of the Department of Medical Assistance Services (DMAS)

that, pursuant to 12 VAC 30-90-20(C), the appellees, eight

nursing home facilities in Virginia that disputed DMAS's

calculation of their Medicaid reimbursement payments, were not

entitled, for the years at issue, to reimbursement for their

Medicaid-related expenses under the higher cost ceiling

applicable to Northern Virginia.  In reversing the DMAS Director's ruling, the circuit court concluded the DMAS Director's interpretation of 12 VAC 30-90-20(C) was contrary to the plain meaning of the regulation and was, thus, arbitrary and capricious.  In that same order, the circuit court also affirmed the DMAS Director's ruling that four of the appellees were time barred from challenging their Medicaid reimbursement payments for five of the years at issue and further held that the appellees were entitled to recover their attorneys' fees and costs subject to a statutory cap of $25,000 applicable to the appellees as a group.  On appeal, DMAS contends the circuit court erred (1) in concluding the DMAS Director's interpretation of the relevant Medicaid regulation was arbitrary and capricious and (2) in awarding attorneys' fees and costs to the appellees.  On cross-appeal, the appellees contend the circuit court erred (1) in affirming the DMAS Director's decision that four of the appellees were time barred from challenging their Medicaid reimbursement payments for certain years and (2) in ruling the fees and costs awarded to the appellees were capped at $25,000 for the appellees as a group.  In addition, the appellees seek an award of appellate attorneys' fees.  For the reasons that follow, we affirm the circuit court's judgment that the DMAS Director's interpretation of 12 VAC 30-90-20(C) was arbitrary and capricious, that the appellees were entitled to attorneys' fees and costs, and that certain appellees were time barred from challenging their reimbursement classifications for certain years.  We reverse the circuit court's judgment that the fees and costs awarded to the appellees were statutorily capped at $25,000

- 2 -

for the appellees as a group and remand this matter to the circuit court for determination of the appropriate attorneys' fees and costs.

## I.    BACKGROUND

The facts in this case are not in dispute.  At all times relevant to this appeal, the appellees, Beverly Healthcare of Fredericksburg, f/k/a Fredericksburg Nursing Home, located in Spotsylvania County; Carriage Hill Nursing Home, located in Spotsylvania County; Heritage Hall—Front Royal, located in Warren County; Heritage Hall—King George, located in King George County; Lynn Care Center, located in Warren County; Oak Springs of Warrenton, located in Fauquier County; Rose Hill Nursing Home, located in Clarke County; and Warrenton Overlook Health & Rehabilitation, f/k/a Warrenton Overlook Care Center, located in Fauquier County, were nursing home facilities participating in Virginia's Medicaid program.[1]  As participants in that program,

---

[1] The times relevant to this appeal vary by appellee, as follows:

| Appellee | Fiscal Years Ending |
|---|---|
| Beverly Healthcare of Fredericksburg | 12/31/94 |
| | 12/31/95 |
| | 12/31/96 |
| Carriage Hill Nursing Home | 6/30/94 |
| | 6/30/95 |
| | 6/30/96 |
| | 6/30/97 |
| Heritage Hall—Front Royal | 12/31/94 |
| | 12/31/95 |
| | 12/31/96 |
| Heritage Hall—King George | 12/31/94 |
| | 12/31/95 |
| | 12/31/96 |
| Lynn Care Center | 12/31/94 |

the appellees were entitled to reimbursement by the Commonwealth for their reasonable and necessary operational and capital costs incurred in providing nursing care and other medical services to Medicaid recipients. DMAS is the state agency responsible for administering Virginia's Medicaid program.

Under the Virginia Medicaid program, each participating nursing facility must submit an annual cost report to DMAS detailing the actual costs incurred by the facility for the care and services provided to Medicaid patients. DMAS then reviews the nursing facility's cost report and issues a "Notice of Program Reimbursement" to the facility setting forth the costs that are to be reimbursed to the facility and the costs that are disallowed under the Medicaid program and identifying any adjustments in the reimbursement payment amount to reflect DMAS's determination that it has underreimbursed or overreimbursed the facility during the cost year under consideration. If the nursing facility disagrees with DMAS's reimbursement determination, the facility may appeal the matter in accordance with the Administrative Process Act and "the state plan for medical assistance." Code § 32.1-325.1(B).

_____

|  |  |
|---|---|
|  | 12/31/95 |
|  | 12/31/96 |
| Oak Springs of Warrenton | 12/31/94 |
|  | 12/31/95 |
|  | 12/31/96 |
| Rose Hill Nursing Home | 12/31/94 |
|  | 12/31/95 |
|  | 12/31/96 |
| Warrenton Overlook Health & Rehabilitation | 9/30/94 |
|  | 9/30/95 |
|  | 9/30/96 |

To control costs, DMAS has instituted cost ceiling limitations, or caps, on the reimbursement of certain costs incurred by nursing facilities in providing service to Medicaid patients. A nursing facility will not be reimbursed for costs that exceed the facility's cap. To ensure that nursing facilities operating in different economic environments in Virginia are reimbursed similarly, DMAS has divided the Commonwealth into three distinct geographic regions or "peer groups," each with its own cap: (1) "the Virginia portion of the Washington DC-MD-VA Metropolitan Statistical Area (MSA)," (2) the "Richmond-Petersburg" MSA, and (3) the "rest of the state." 12 VAC 30-90-20(C). Because the urban area in which they operate is generally more expensive, nursing facilities in the "Virginia portion of the Washington DC-MD-VA" MSA (Northern Virginia MSA) peer group have a higher reimbursement cap than those in the "rest of the state" peer group.

To determine, for Medicaid reimbursement purposes, whether a nursing facility is in one of the MSA peer groups or in the "rest of the state" peer group, DMAS relies on the list of urban-area jurisdictions published in a final rule by the Health Care Financing Administration (HCFA), the federal agency within the United States Department of Health and Human Services that administers the Medicare program. See id. Generally, a facility located in a city or county included on HCFA's list of constituent jurisdictions of the Northern Virginia urban area or the Richmond-Petersburg urban area is considered a member of that respective area's corresponding MSA peer group. See id. Conversely, a facility located in a jurisdiction not included on

- 5 -

HCFA's list of jurisdictions in either the Northern Virginia or Richmond-Petersburg urban area is considered a member of the "rest of the state" peer group.  See id.

In compiling and revising its list of urban areas, HCFA relies, in turn, on the latest list of MSAs published by the federal Office of Management and Budget (OMB).  Applying decennial census data and federal Census Bureau population estimates to various standards, OMB designates certain geographic areas of the country as MSAs.  The boundaries of each MSA reflect OMB's judgment that, for statistical purposes, the jurisdictions located within those boundaries constitute metropolitan areas.[2] OMB periodically revises its MSA designations to reflect changing populations and economic conditions, adding new jurisdictions that, based on the most current data and standards, qualify as metropolitan areas or removing jurisdictions that no longer qualify.  When HCFA updates Medicare payment rates, it adopts OMB's latest revised MSA designations, which remain in effect until new MSA designations are adopted by HCFA and published in a final rule.

_____

[2] As OMB explains,

> OMB establishes and maintains the definitions of the [metropolitan areas] solely for statistical purposes.  In periodically reviewing and revising the [metropolitan areas], OMB does not take into account or attempt to anticipate any nonstatistical uses that may be made of the definitions, nor will OMB modify the definitions to meet the requirements of any nonstatistical program.

OMB Bulletin No. 95-04 1 (June 30, 1995).

On June 30, 1993, OMB published an updated list of MSA designations based on data from the 1990 census.  As reflected in that list, the Northern Virginia MSA had been expanded to include the jurisdictions in which each of the appellees was located.

On September 1, 1993, HCFA published a final rule adopting OMB's June 30, 1993 revised MSA designations for purposes of

Medicare[3] reimbursement payments to hospitals, effective October 1, 1993.  See Rules and Regulations, 58 Fed. Reg. 46270 (September 1, 1993).  HCFA explained its adoption of OMB's new MSA designations for purposes of hospital reimbursement as follows:

> Under the Medicare prospective payment system, different payment rates are calculated for hospitals located in rural, urban, and large urban areas.  For purposes of the standardized payment amount, section 1886(d)(2)(D) of the Social Security Act requires that we use Metropolitan Statistical Areas (MSAs) as defined by the office of Management and Budget (OMB) to determine whether hospitals are located in rural, urban or large urban areas.

> *      *      *      *      *      *      *

> . . .  OMB announced changes [in the MSA designations] and we have adopted those changes in this final rule.  Table 4a of the wage index tables in the addendum to this final rule lists the MSAs and their member counties as set forth in OMB's announcement.

Id. at 46291-92.  As reflected in Table 4a of HCFA's final rule, the Northern Virginia urban area had been expanded to include the jurisdictions in which each of the appellees was located: Spotsylvania County, Warren County, King George County, Fauquier County, and Clarke County.  Id. at 46386.

On January 6, 1994, HCFA published a final notice advising that, because the Omnibus Budget Reconciliation Act of 1993, enacted by Congress on August 10, 1993, required that there be no

_____

[3] Medicare is a separate and distinct program from Medicaid. Medicaid is a state-run welfare program, providing medical assistance primarily to indigent persons.  In contrast, Medicare is a medical insurance program for the elderly, irrespective of income, that is administered by the federal government. Although some of the regulations of the two programs overlap,

increases in Medicare cost limits for nursing facilities until October 1, 1995, the revised MSA designations established by OMB on June 30, 1993, would not be adopted for purposes of Medicare reimbursements for nursing facilities until at least October 1, 1995. See Notices, 59 Fed. Reg. 762-64 (January 6, 1994). On October 1, 1997, HCFA published a final notice providing for the implementation of the revised MSA designations, including the added Northern Virginia jurisdictions, for purposes of Medicare reimbursements for nursing facilities, effective that date. See Notices 62 Fed. Reg. 51536-38, 51548 (October 1, 1997).

Concluding HCFA's adoption on September 1, 1993, of OMB's June 30, 1993 revised MSA designations, for purposes of Medicare reimbursement for hospitals but not for nursing facilities, did not require the implementation of the new MSA designations for purposes of Medicaid reimbursement for Virginia nursing facilities, DMAS did not include the jurisdictions in which the appellees were located in the Northern Virginia MSA until October 1, 1997, when HCFA specifically adopted the new MSA designations for the purpose of Medicare reimbursement for nursing facilities. Accordingly, prior to October 1, 1997, DMAS calculated the Medicaid reimbursements for the appellees using a reimbursement cap applicable to the "rest of the state" peer group, rather than the higher cap applicable to the Northern Virginia MSA peer group.

On September 26, 1996, the appellees wrote to the Director of DMAS requesting that he issue a case decision implementing the June 30, 1993 revised MSA designations effective October 1, 1993.

_____

Medicaid has its own set of rules.

- 9 -

By letter dated October 4, 1996, the DMAS Director declined to consider the merits of the appellees' dispute and advised the appellees that DMAS's decisions regarding reimbursement were appealable in accordance with the Administrative Process Act.  By letter dated October 11, 1996, the appellees notified the Director of DMAS that they were appealing DMAS's failure to include the appellees in the Northern Virginia MSA peer group for the prior fiscal years commencing in 1994.  Counsel for the appellees further noted in that letter, as follows:

> I write in response to your October 4 letter which declines to issue a case decision addressing the DMAS position on the Northern Virginia Peer Group issue.  Instead your letter indicates that this issue should be addressed through the DMAS audit and appeal process.  You take this position despite the fact that "[the] organization of participating facilities into peer groups according to location as a proxy for cost variation across state facilities with similar operating characteristics" is specifically identified in the DMAS appeal regulations as a non-appealable issue.  See Nursing Home Payment System § 3.1.B.2.
> We do not believe that your position on this matter is reconcilable with this regulation, but to move this matter forward, the above facilities are submitting this appeal notice with a reservation of all right to contest your determination. . . .
>
> *   *   *   *   *   *   *
>
> Given your October 4, 1996 letter, we trust that DMAS will accept this notice and promptly schedule appeal hearings on the above facilities and cost years despite the fact that the DMAS appeal regulations themselves state that issues related to peer group designation are not appealable through the normal audit and appeal process.

In response to appellees' notice of appeal, an informal fact-finding conference was conducted on November 7, 1997, and a

- 10 -

decision in DMAS's favor was issued on May 1, 1998. The appellees appealed that decision, and a formal hearing was held on October 26, 1999. The hearing officer issued a recommendation on November 10, 2000, in favor of the appellees. The DMAS Director rendered a final case decision on April 27, 2001, rejecting the hearing officer's recommendation. The Director ruled (1) that, because HCFA did not implement the new MSA designations for purposes of nursing facility reimbursement until October 1, 1997, DMAS had correctly classified the appellees as being in the "rest of the state" peer group between September 1, 1993, and October 1, 1997, and (2) that four of the appellees were time barred from appealing their peer group classification for five of the fiscal years at issue because their appeal requests were not filed within ninety business days of receipt of the Notice of Program Reimbursement (NPR) for those years, as required by 12 VAC 30-90-131, as follows:

| Facility | Fiscal Year Ending | NPR | Appeal |
|----------|-------------------|-----|--------|
| Beverly Healthcare | 12/31/94 | 12/19/95 | 10/11/96 |
| Rose Hill Nursing Home | 12/31/94 | 12/19/95 | 10/11/96 |
| Oak Springs | 12/31/94 | 2/1/96 | 10/11/96 |
| Warrenton Overlook | 9/30/94 | 8/7/95 | 10/11/96 |
|  | 9/30/95 | 9/30/95 | 10/11/96.[4] |

Each of the eight appellees filed a separate notice of appeal with DMAS, indicating its intention to appeal the DMAS Director's case decision to the circuit court.[5] Noting their

_____

[4] The appellees do not dispute these factual findings by the DMAS Director.

[5] Beverly Healthcare of Fredericksburg, which is located in Spotsylvania County, filed its notice of appeal with DMAS on May 29, 2001. The other seven appellees filed their notices of appeal on May 30, 1991.

- 11 -

compliance with Rules 2A:3(b) and 2A:4(a),[6] the appellees filed a

joint petition for appeal with the circuit court on June 26,

2001.  The appellees also subsequently filed a joint request for

an award of their attorneys' fees and costs incurred in

connection with the judicial appeal, in the amount of $62,291.92

(approximately $7,786 for each appellee).[7]

After conducting several hearings on the matter, the circuit

court ruled in its final order of March 5, 2002, that (1) the

DMAS Director's decision that, for purposes of Medicaid

reimbursement for the years relevant to this appeal, the

appellees were not members of the Northern Virginia MSA peer

group was contrary to the plain meaning of 12 VAC 30-90-20(C)

and, thus, arbitrary and capricious; (2) the DMAS Director's

decision that four of the appellees were time barred from

appealing their peer group classification for five of the fiscal

---

[6] Rule 2A:3(b) provides, in pertinent part, as follows:

> In the event of multiple appeals in the
> same proceeding, only one record need be
> prepared and it shall be transmitted to the
> clerk of the court named in the first notice
> of appeal filed.  If there are multiple
> appeals to different courts from the same
> regulation or case decision, all such
> appeals shall be transferred to and heard by
> the court having jurisdiction that is named
> in the notice of appeal that is the first to
> be filed.

Rule 2A:4(a) provides, in pertinent part, that, "[w]ithin
30 days after the filing of the notice of appeal, the appellant
shall file his petition for appeal with the clerk of the circuit
court named in the first notice of appeal to be filed."

[7] Throughout the proceedings in this case, both before DMAS
and the circuit court, the appellees were represented by the

years at issue was correct; and (3) the appellees were entitled by law to an award of attorneys' fees and costs, in an amount statutorily capped at $25,000 for the appellees as a group ($3,125 for each appellee), because "the instant case constitutes a single case for purposes of the $25,000 limit on the award of fees pursuant to . . . Code § 2.2-4030."

This appeal and cross-appeal followed.

same counsel and law firm representing them in this appeal.

II.  DMAS'S APPLICATION OF MEDICAID REGULATIONS

A.  Standard of Review

Here, we are asked to review DMAS's interpretation and application of its own regulations governing Medicaid principles of reimbursement.

> In reviewing decisions by DMAS, an appellate court accords great deference to . . . the agency's . . . interpretation of the laws applicable to "the reimbursement due qualified providers for their reasonable costs incurred while delivering health care services."  This Court will overturn DMAS'[s] "interpretations of the statutes and regulations governing Medicaid . . . principles of reimbursement . . . only . . . when found to be arbitrary and capricious."

Beverly Health and Rehab. Servs., Inc. v. Metcalf, 24 Va. App. 584, 592, 484 S.E.2d 156, 160 (1997) (quoting Fralin v. Kozlowski, 18 Va. App. 697, 701, 447 S.E.2d 238, 241 (1994)). Additionally, we are required, "in reviewing an agency decision, . . . to consider . . . the purposes of the basic law under which the agency acted." Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 246, 369 S.E.2d 1, 9 (1988).

B.  12 VAC 30-90-20(C)

DMAS contends the circuit court erred in ruling that the DMAS Director's decision that, for the years relevant to this appeal, the appellees were in the "rest of the state" peer group, rather than the Northern Virginia MSA peer group, was arbitrary and capricious.  In reaching that decision, DMAS maintains, the circuit court improperly substituted its own independent judgment for that of DMAS, the agency charged with administering Virginia's Medicaid program.  DMAS argues that, pursuant to 12 VAC 30-90-20(C), DMAS must look "to the actions" of HCFA in

placing a nursing facility in a particular peer group. "When, for purposes of reimbursement, HCFA determines that a nursing facility should be reimbursed based on its placement in a particular MSA, then DMAS must follow HCFA's actions," DMAS asserts. DMAS further asserts that HCFA published a list incorporating the new MSA designations, including the updated Northern Virginia MSA, on September 1, 1993; however, that updated list of MSA designations was "only meant for hospital reimbursement purposes." HCFA did not adopt and implement the updated Northern Virginia MSA for purposes of nursing facility reimbursement, DMAS argues, until October 1, 1997. Consequently, DMAS's argument continues, the jurisdictions in which the appellees were located were not added to the Northern Virginia MSA for purposes of Medicaid reimbursement of nursing facilities until October 1, 1997. Accordingly, DMAS concludes, the DMAS Director's determination that the appellees were not members of the Northern Virginia MSA peer group from September 1, 1993, to October 1, 1997, was proper and, thus, not arbitrary and capricious.

The appellees argue that the DMAS Director, in deciding the appellees were not members of the Northern Virginia MSA peer group until October 1, 1997, and, thus, were not entitled to reimbursement for their Medicaid-related expenses under the higher cost ceiling applicable to that peer group, disregarded and misapplied the plain language of 12 VAC 30-90-20(C). Hence, the appellees contend, the circuit court correctly concluded that the DMAS Director's decision was arbitrary and capricious and properly reversed that decision.

The issue before us, then, is whether the circuit court erred in holding that the DMAS Director's decision that, for purposes of Medicaid reimbursement, the appellees were members of the "rest of the state" peer group from September 1, 1993, to October 1, 1997, rather than the Northern Virginia MSA peer group, was arbitrary and capricious. The resolution of that issue turns on whether the DMAS Director correctly interpreted the plain language of the relevant regulation, 12 VAC 30-90-20(C). See, e.g., Smith v. Liberty Nursing Home, Inc., 31 Va. App. 281, 296-97, 522 S.E.2d 890, 897 (2000) (holding that, because the DMAS Director "disregarded the plain language" of the controlling regulation, "he arbitrarily and capriciously interpreted the regulation"). We hold he did not.

Regulation 12 VAC 30-90-20(C) provides, in pertinent part, as follows:

> [I]n determining the ceiling limitation, there shall be . . . patient care medians established for nursing facilities in the [Northern Virginia MSA], the Richmond-Petersburg [MSA], and in the rest of the state. . . . The [Northern Virginia] MSA and the Richmond-Petersburg MSA shall include those cities and counties as listed and changed from time to time by the Health Care Financing Administration (HCFA). A nursing facility located in a jurisdiction which HCFA adds to or removes from the [Northern Virginia] MSA or the Richmond-Petersburg MSA shall be placed in its new peer group, for purposes of reimbursement, at the beginning of its next fiscal year following the effective date of HCFA's final rule.

(Emphasis added.)

As relevant to the instant case, the plain language of the regulation establishes a clear and direct mandate: When HCFA, the federal Medicare agency, indicates in a final rule that it

- 16 -

has added a jurisdiction to either the Northern Virginia MSA or the Richmond-Petersburg MSA, DMAS, the state Medicaid agency, must add, for Medicaid reimbursement purposes, each participating nursing facility located in that jurisdiction to the corresponding MSA peer group "at the beginning of [the facility's] next fiscal year following the effective date of HCFA's final rule."  12 VAC 30-90-20(C).  Nothing in the plain language of the regulation suggests, as DMAS argues, that DMAS's addition of a facility to an MSA peer group is limited strictly to when HCFA implements revised MSA designations specifically for purposes of Medicare reimbursement of nursing facilities, rather than of other medical facilities.  Indeed, the plain language of the regulation clearly indicates that DMAS's inclusion of a facility in a MSA peer group does not depend on any action by HCFA other than HCFA's mere inclusion of the jurisdiction in which the facility is located on its list in a final rule of the revised MSA designations it has adopted.  In formulating its regulations, DMAS could have provided that nursing facilities were to be added to peer groups only when HCFA specifically implemented revised MSA designations for purposes of reimbursing nursing facilities, but it did not.[8]  DMAS is bound by the plain language of its own regulation.

_____

[8] DMAS acknowledges, on appeal, that the DMAS Director's interpretation of 12 VAC 30-90-20(C) results in the following reading of the regulation:

> A nursing facility located in a
> jurisdiction which HCFA adds to or removes
> from the [Northern Virginia] MSA or the
> Richmond-Petersburg MSA shall be placed in
> its new peer group, for purposes of

Here, on September 1, 1993, HCFA published a final rule updating Medicare reimbursement payments to hospitals, effective October 1, 1993.  In that final rule, HCFA specifically adopted OMB's latest revised MSA designations, which expanded the Northern Virginia MSA to include the jurisdictions in which each of the appellees was located.  HCFA also specifically included each of those jurisdictions in its list in the final rule of the MSAs it was adopting.  Hence, in accordance with the plain language of 12 VAC 30-90-20(C), DMAS was required to place the appellees in the Northern Virginia MSA peer group and reimburse them using the higher cap applicable to that peer group "at the beginning of [each facility's respective] next fiscal year following" October 1, 1993.  Id.  In failing to do so for the years relevant to this appeal, DMAS did not comply with the clear and direct mandate of its own regulation.

This resolution of the issue is buttressed by our consideration of the underlying purpose of 12 VAC 30-90-20(C). The regulation was promulgated to establish higher reimbursement caps for nursing facilities located in metropolitan areas and, thus, avoid the effect, inherent in a reimbursement system with a single uniform cap, of penalizing facilities in urban areas simply because they operate in jurisdictions where costs are generally higher than those in which their rural counterparts operate.  On June 30, 1993, OMB announced revised MSA designations indicating that, based on data from the 1990 census,

reimbursement, at the beginning of its next fiscal year following the effective date of HCFA's final rule [changing MSA designations for nursing facilities].

- 18 -

the jurisdictions in which each of the appellees was located shared the same statistical characteristics as the other urban areas in the Northern Virginia MSA and, thus, were to be included in that MSA. On September 1, 1993, HCFA adopted those revised MSA designations in a final rule. Irrespective of whether HCFA's final rule governed Medicare reimbursement of hospitals or nursing facilities, the jurisdictions in which the appellees were operating were recognized by HCFA as being urban in nature. Accordingly, in terms of realizing the regulation's underlying purpose, it is irrelevant whether HCFA recognized a change in the Northern Virginia MSA in a nursing facility or hospital rule. The recognition, itself, is what matters.

We hold, therefore, that the DMAS Director's decision that, for purposes of Medicaid reimbursement, the appellees were members of the "rest of the state" peer group from September 1, 1993, to October 1, 1997, rather than the Northern Virginia MSA peer group, was contrary to the plain meaning of 12 VAC 30-90-20(C). Accordingly, we affirm the circuit court's judgment that the DMAS Director's decision was arbitrary and capricious.

### C.  12 VAC 30-90-131

The appellees contend the circuit court erred in affirming the DMAS Director's decision that, pursuant to 12 VAC 30-90-131,[9] four of the appellees were time barred from challenging their Medicaid reimbursement payments for five fiscal years, as follows:

---

[9] Regulation 12 VAC 30-90-131 has subsequently been repealed. The provisions governing appeals by nursing facilities of DMAS's adjustments to cost reports are currently

- 19 -

```
   Appellees            Fiscal Year Ending

Beverly Healthcare           12/31/94
Rose Hill Nursing Home       12/31/94
Oak Springs                  12/31/94
Warrenton Overlook            9/30/94
                              9/30/95.
```

The appellees argue that the DMAS Director's interpretation and
application of 12 VAC 30-90-131 is arbitrary and capricious.  We
disagree.

In pertinent part, 12 VAC 30-90-131 provided:

> An appeal shall not be heard until the
> following conditions are met:
>
> *     *     *     *     *     *     *
>
> 3.  All first level appeal requests shall be
> filed in writing with the DMAS within 90
> business days following the date of a DMAS
> notice of program reimbursement that
> adjustments have been made to a specific cost
> report.

Thus, as the DMAS Director noted in his final case decision, a
nursing facility "desiring to challenge a [reimbursement] payment
decision made by DMAS must file a written notice of appeal within
90 days of receiving the Notice of . . . Program Reimbursement
. . . that triggers the payment dispute."

It is undisputed that the Notices of Program Reimbursement
received by the four appellees listed in the table above for the
five fiscal years listed reflected Medicaid reimbursement
payments in accordance with the caps applicable to the "rest of
state" peer group rather than the Northern Virginia MSA peer
group.  It is further unchallenged that, although they disputed
DMAS's failure to adjust their cost reports in the Notices of

_____

set forth in 12 VAC 30-20-540.

- 20 -

Program Reimbursement to reflect their inclusion in the Northern

Virginia MSA peer group, the four appellees did not file notices

of appeal within ninety business days of receipt of the Notice of Program Reimbursement for the five years at issue. Accordingly, as the circuit court held, the appeals for those four appellees for the fiscal years listed are time barred under 12 VAC 30-90-131.

While not disputing that the regulation operates as a statute of limitations for appeals, the appellees maintain that DMAS's own actions rendered the filing deadline in 12 VAC 30-90-131 inapplicable in this case. The appellees argue (1) that 12 VAC 30-90-130(B)(2)[10] prohibited them from challenging DMAS's failure to place them in the Northern Virginia MSA peer group because it declared the issue "nonappealable"; (2) that, in advising the appellees in his letter of October 4, 1996, to use DMAS's administrative appeals process to raise their concern, the DMAS Director effectively waived 12 VAC 30-90-131's ninety-day filing deadline; and (3) that, in "holding such an appeal" for all the appellees and for all fiscal years, DMAS effectively sanctioned the timing of the appeal as to all appellees and all years at issue. The appellees' arguments are without merit.

Regulation 12 VAC 30-90-130(B)(2) provided that nursing facilities "have the right to appeal . . . DMAS'[s] interpretation and application of state . . . Medicaid . . . principles of reimbursement in accordance with the Administrative Process Act." The regulation also provided that "[t]he organization of participating [nursing facilities] into peer groups according to location as a proxy for cost variation across

_____

[10] Regulation 12 VAC 30-90-130 has subsequently been repealed.

- 22 -

state facilities with similar operating characteristics" is a nonappealable issue. Reading these two provisions together, the DMAS Director held that, while 12 VAC 30-90-130(B)(2) prohibits a nursing facility from appealing DMAS's "authority granted by regulation to use MSA grouping as a mechanism in the rate-setting process," it does not bar a nursing facility from challenging the correctness of its peer group assignment at the time the Notice of Program Reimbursement is received. The DMAS Director's interpretation of 12 VAC 30-90-130(B)(2) is reasonable. The principles of reimbursement are not subject to appeal under 12 VAC 30-90-130(B)(2), but the interpretation and application of those principles clearly are. The issue in this case is not whether DMAS had the authority to organize nursing facilities into peer groups—a principle of reimbursement—but whether DMAS properly applied 12 VAC 30-90-20(C) when it assigned the appellees to the "rest of state" peer group for the years relevant to this appeal even though they were located in jurisdictions added to the Northern Virginia MSA by HCFA—an interpretation and application of a principle of reimbursement. Accordingly, 12 VAC 30-90-130(B)(2) did not prohibit the appellees from appealing DMAS's failure to place them in the Northern Virginia MSA peer group.

Likewise, the appellees' reliance on the DMAS Director's letter of October 4, 1996, is misplaced. In issuing that letter, the DMAS Director was responding to the appellees' September 26, 1996 letter requesting that he issue a case decision implementing the updated MSA designations recognized by HCFA, effective October 1, 1993. In his response, the DMAS Director neither

passed judgment on the timeliness of the appellees' request under 12 VAC 30-90-131 nor extended the time for filing an appeal. He merely declined to consider the merits of the appellees' dispute and advised the appellees that DMAS's decisions regarding reimbursement were appealable in accordance with the Administrative Process Act. Accordingly, the appellees' reliance on the Director's letter as a waiver of the filing deadlines was at their own peril.

Furthermore, the fact that DMAS conducted an informal fact-finding conference in response to appellees' notice of appeal in no way obviates the requirement that the appellees timely file their appeal requests with DMAS in accordance with 12 VAC 30-90-131. Similarly, the fact that all of the appellees' appeals were addressed at the informal fact-finding conference does not bar DMAS from subsequently determining the timeliness of the appeals. See Westminster-Canterbury of Hampton Rds., Inc. v. Virginia Beach, 238 Va. 493, 503, 385 S.E.2d 561, 566 (1989) (holding that the doctrine of estoppel does not apply to the Commonwealth "when acting in a governmental capacity").

The appellees also maintain that the time limits imposed by 12 VAC 30-90-131 do not apply in this case because a cost report "adjustment" has not yet occurred. The regulation's ninety-day filing deadline is triggered, appellees assert, only upon receipt by a nursing facility of notice by DMAS that "adjustments" were made to the facility's cost report. In this instance, the appellees argue,

> no adjustment has been made to the
> [appellees'] cost reports denying their
> inclusion in the Northern Virginia Peer

> Group. Since there has been no adjustment made to the cost reports for the years under appeal pertaining to the issue under appeal, the 90-day post-adjustment period contemplated by 12 VAC 30-90-131 has not been triggered.

We find the appellees' reading of 12 VAC 30-90-131 too restrictive. We believe that, as used in 12 VAC 30-90-131, the term "adjustments" not only contemplates changes made by DMAS to a nursing facility's cost report but also DMAS's failure to make required changes to a facility's cost report in the Notice of Program Reimbursement. For example, if DMAS underreimbursed a nursing facility during the fiscal year, it would be absurd to suggest that DMAS's failure to make any adjustment in the Notice of Program Reimbursement to correct that underpayment would not trigger the time limit under 12 VAC 30-90-131 while DMAS's inclusion of the wrong adjustment amount in the Notice of Program Reimbursement would. Both are improper "adjustments" under 12 VAC 30-90-131 and both would trigger the regulation's filing deadline.

Here, the appellees disputed DMAS's failure to adjust their cost reports to reflect their inclusion in the Northern Virginia MSA peer group in accordance with HCFA's recognition that the jurisdictions in which they were located were a part of the Northern Virginia MSA. Hence, the appellees' receipt of the Notices of Program Reimbursement in which DMAS failed to make the disputed peer-group adjustment to their cost reports triggered the filing deadline set forth in 12 VAC 30-90-131.

For these reasons, we affirm the circuit court's judgment that the DMAS Director correctly determined that, pursuant to 12

VAC 30-90-131, four of the appellees were time barred from challenging their Medicaid reimbursement payments for five of the fiscal years at issue, as noted above.

### III.  ATTORNEYS' FEES AND COSTS

### A.  Standard of Review

Here, we are asked to review the circuit court's interpretation and application of Code § 2.2-4030.  Accordingly, we review the circuit court's judgment de novo.  See Sink v. Commonwealth, 28 Va. App. 655, 658, 507 S.E.2d 670, 671 (1998) (noting that, "[a]lthough the trial court's findings of historical fact are binding on appeal unless plainly wrong, we review the trial court's statutory interpretations and legal conclusions de novo").

### B.  Appellees' Entitlement to Fees and Costs

DMAS contends the circuit court erred in awarding attorneys' fees and costs to the appellees.  Specifically, DMAS argues the circuit court erred in rejecting DMAS's argument that its position was "substantially justified."  We disagree.

The Administrative Process Act generally requires that, absent special circumstances, a party bringing a civil case under the Act who is successful on the merits in challenging unjustified agency action be awarded attorneys' fees and costs:

> In any civil case brought under Article 5
> (§ 2.2-4025 et seq.) of this chapter or
> §§ 2.2-4002, 2.2-4006, 2.2-4011, or
> § 2.2-4018, in which any person contests any
> agency action, such person shall be entitled
> to recover from that agency . . . reasonable
> costs and attorneys' fees if such person
> substantially prevails on the merits of the
> case and the agency's position is not
> substantially justified, unless special
> circumstances would make an award unjust.

> The award of attorneys' fees shall not exceed
> $25,000.

Code § 2.2-4030(A) (formerly Code § 9-6.14:21(A)).  Thus, the appellees are entitled to recover their reasonable costs and fees if (1) they substantially prevailed on the merits of the case, (2) the agency's position is not substantially justified, and (3) there are no special circumstances that would make an award unjust.  We conclude, as did the circuit court, that all three conditions are satisfied in this matter for each of the appellees.

Firstly, we have previously determined that the appellees substantially prevailed on the merits of the case.  Secondly, we have also previously determined that the DMAS Director's ruling that the appellees were not members of the Northern Virginia MSA peer group for the years relevant to this appeal was contrary to the plain meaning of the applicable regulation and, thus, arbitrary and capricious.  Having determined that DMAS misinterpreted and misapplied the plain meaning of the relevant regulation, we cannot say, as a matter of law, that DMAS's position in this case was "substantially justified."  DMAS offers no authority that persuades us otherwise.  Thirdly, as the circuit court found, there are no special circumstances that would render an award of fees and costs unjust.

Accordingly, the circuit court did not err in ruling the appellees were entitled to recovery of their attorneys' fees and costs for the proceedings in the circuit court, and we affirm that ruling.

## C.  Limit on Fees and Costs

The appellees contend the circuit court erred in ruling the attorneys' fees and costs awarded to the appellees were capped at $25,000 for the appellees as a group.  Specifically, the appellees argue the circuit court (1) failed to recognize that the $25,000 statutory cap is a limit on attorneys' fees only and (2) improperly applied the $25,000 statutory cap on attorneys' fees to the appellees as a group, rather than individually.  We agree with both of the appellees' arguments.

### 1.  Costs

It is well established that,

> [w]hile in the construction of statutes the constant endeavor of the courts is to ascertain and give effect to the intention of the legislature, that intention must be gathered from the words used, unless a literal construction would involve a manifest absurdity.  Where the legislature has used words of a plain and definite import the courts cannot put upon them a construction which amounts to holding the legislature did not mean what it has actually expressed.

Floyd, Trustee v. Harding & als., 69 Va. (28 Gratt.) 401, 405 (1877).

By its own terms, Code § 2.2-4030(A) plainly distinguishes between "attorneys' fees" and "costs."  The first sentence of the statute provides that a qualified party "shall be entitled to recover . . . reasonable costs and attorneys' fees."  Code § 2.2-4030(A) (emphasis added).  The next sentence of the statute provides that the "award of attorneys' fees shall not exceed $25,000."  Id. (emphasis added).  Absent from the statute is any language limiting the recovery of costs.  Accordingly, the $25,000 cap applies only to attorneys' fees and the circuit court erred in also applying the cap in its final order of March 5,

2002, to the appellees' costs.  See City of Hopewell v. County of Prince George, 239 Va. 287, 294, 389 S.E.2d 685, 689 (1990) (observing that, "[w]hen the legislature uses two different terms in the same act, it is presumed to mean two different things").

## 2.  Attorneys' Fees

Following the issuance of the DMAS Director's final case decision on April 27, 2001, each of the eight appellees timely filed a separate notice of appeal with DMAS, indicating its intention to appeal the Director's decision to the circuit court. Noting their compliance with Rules 2A:3(b) and 2A:4(a), the appellees then timely filed a joint petition for appeal with the circuit court.

In support of their contention that the circuit court misapplied the $25,000 limit on attorneys' fees to them as a group, the appellees submit that, because each individual appellee independently filed its own notice of appeal with DMAS, the proceeding in the circuit court involved eight separate appeals, which were then consolidated into a single proceeding in compliance with Rules 2A:3(b) and 2A:4(a).  Thus, the appellees argue, each appellee effectively brought its own separate civil case under the Administrative Process Act.  Accordingly, the appellees conclude, Code § 2.2-4030(A)'s $25,000 limit on the recovery of attorneys' fees should apply separately to each appellee.

DMAS argues to the contrary that, because there was literally only one case before the circuit court, "with one central issue common to each party," and only one agency case decision from which the appellees appealed, the circuit court

- 29 -

correctly decided that "the instant case constitutes a single civil case" under Code § 2.2-4030(A) and properly limited the appellees' overall award of attorneys' fees to $25,000. Adoption of the appellees' interpretation of Code § 2.2-4030(A), DMAS argues, would violate the plain language of the statute and lead to absurd results if, for example, there were a hundred nursing facilities involved in a case like this.

The issue before us, then, is whether, for purposes of Code § 2.2-4030(A)'s $25,000 limit on the award of attorneys' fees, the appellees' appeals to the circuit court of the DMAS Director's case decision constitute a single case or eight separate cases in the circuit court. Settled principles of statutory construction guide us in the resolution of this issue.

In interpreting a statute, we "assume that 'the legislature chose, with care, the words it used when it enacted the relevant statute, and we are bound by those words as we interpret the statute.'" City of Virginia Beach v. ESG Enters., Inc., 243 Va. 149, 153, 413 S.E.2d 642, 644 (1992) (quoting Barr v. Town and Country Props., 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990)). Additionally,

> we examine [the] statute in its entirety, rather than by isolating particular words or phrases. When the language in a statute is clear and unambiguous, we are bound by the plain meaning of that language. We must determine the General Assembly's intent from the words appearing in the statute, unless a literal construction of the statute would yield an absurd result.

Cummings v. Fulghum, 261 Va. 73, 77, 540 S.E.2d 494, 496 (2001) (citations omitted). "However, when statutory construction is required, we construe a statute to promote the end for which it

- 30 -

was enacted, if such an interpretation can reasonably be made from the language used."  Mayhew v. Commonwealth, 20 Va. App. 484, 489, 458 S.E.2d 305, 307 (1995).  "Thus, a statute should be read to give reasonable effect to the words used 'and to promote the ability of the enactment to remedy the mischief at which it is directed.'"  Id. (quoting Jones v. Conwell, 227 Va. 176, 181, 314 S.E.2d 61, 64 (1984)).  "Generally, the words and phrases used in a statute should be given their ordinary and usually accepted meaning unless a different intention is fairly manifest."  Woolfolk v. Commonwealth, 18 Va. App. 840, 847, 447 S.E.2d 530, 534 (1994).

Applying these principles to the language of Code § 2.2-4030(A) relevant to this issue, we conclude, mindful of the legislative goal promoted by the statute, that the construction urged by the appellees is the proper interpretation of the statute.  The "mischief" at which Code § 2.2-4030(A) is directed is the unjustified action of an agency.  The statute clearly expresses the legislature's intent to allow a party that successfully challenges the agency's action to recover its attorneys' fees, up to $25,000.  In permitting "any person" in "any civil case" to recover fees up to the stated limit, we believe the legislature intended in a case like this, where each appellee independently filed with DMAS its own notice of appeal, which was then consolidated with the other appellees' appeals in accordance with the Rules of the Supreme Court into a single proceeding in the circuit court, that each of the notices of appeal independently filed by the appellees represented the commencement of a separate civil case.  Each case, although

related to the other appellees' cases, presented its own issues with regard to the jurisdiction and fiscal years involved and the timeliness of the filings in that case. The consolidation of those cases, while it combined the cases for purposes of review by the circuit court, did not alter the nature of the individual cases brought by the appellees.

We conclude, therefore, that Code § 2.2-4030(A)'s $25,000 limit on the recovery of attorneys' fees applies separately to each appellee, rather than to the appellees as a group. Accordingly, we reverse the circuit court's judgment and remand this matter to the circuit court for determination and award of the appropriate attorneys' fees and costs due the appellees for services rendered on their behalf in the circuit court, as well as for this appeal.

## IV. CONCLUSION

In summary, we affirm the circuit court's judgment that the DMAS Director's interpretation of 12 VAC 30-90-20(C) was arbitrary and capricious, that the appellees were entitled to attorneys' fees and costs, and that four of the appellees were time barred from challenging their peer group reimbursement classifications for five of the fiscal years relevant to this appeal. We also reverse the circuit court's judgment that the fees and costs awarded to the appellees were statutorily capped at $25,000 for the appellees as a group and remand this case to the circuit court for further proceedings consistent with this opinion.

<u>Affirmed in part,
reversed in part,
and remanded.</u>

- 32 -